IN THE MATTER OF: THE APPEAL OF LOUISE PARSONS AND JULIAN PRICE FROM THE DECISION OF THE WAKE COUNTY BOARD OF EQUALIZATION AND REVIEW CONCERNING PROPERTY TAXATION FOR 1992

No. COA95-961

(Filed 2 July 1996)

**Taxation § 87 (NCI4th)— evaluation of property—arbitrary method used by County**

Taxpayer appellees sufficiently met their burden of showing that Wake County used an arbitrary method of valuation which substantially exceeded the true value in money of taxpayers' property where the evidence showed that Wake County's appraiser had never appraised an undeveloped tract of land in Wake County of the size at issue in the present case; he admitted he never visited the property until a year after its valuation; all but one of the comparable sales used in his valuation occurred after the appraisal date; three of the comparables had higher density development than that which was appropriate for the subject property; the appraiser failed to make adjustments for topography, slope, or shape; the County's methodology of using a development approach solely for comparison with the sales comparison approach was inappropriate because Wake County used more lots than was feasible for the property, used a lot sales price that was too high, and an absorption rate that was too rapid; taxpayers' evidence showed that the highest and best use of the property given its location, zoning, topography, and other characteristics was residential development with 186 lots of one-half acre

IN RE APPEAL OF PARSONS

[123 N.C. App. 32 (1996)]

each; their appraiser and expert used two valuation methods (the sales comparison approach and the development approach) which yielded substantially the same values, which were more than a third less than the County's value; and taxpayers' expert testified that the development approach most closely approximated true value.

**Am Jur 2d, State and Local Taxation §§ 759-763.**

**Sale price of real property as evidence in determining value for tax assessment purposes. 89 ALR3d 1126.**

Appeal by Wake County from the North Carolina Property Tax Commission's decision entered 16 May 1995, affirming and adopting the Commission Representative's Recommendations reducing the appraised value of plaintiffs' property from $3,376,865 to $1,900,000. Heard in the Court of Appeals 24 April 1996.

*Wake County Attorney's Office, by Deputy County Attorney Shelley T. Eason, for Wake County.*

*Wilson & Iseman, L.L.P., by G. Gray Wilson and Elizabeth Horton, for taxpayers-appellees.*

JOHNSON, Judge.

Taxpayers Louise Parsons and Julian Price (taxpayers) are the owners of record of real property known as the Parsons-Price tract (tract). The tract is 194.77 acres of undeveloped land located on the west side of Pinecrest Road and the north side of U.S. Highway 70 West (Glenwood Avenue) across from Umstead State Park in Raleigh's extraterritorial jurisdiction. The tract's topography is rolling with gentle slopes. The north, west and east sites of the tract contain average to above-average residential subdivisions developed mostly in the 1970's and 1980's. Raleigh-Durham Airport is two miles to the northwest, but the subject property is not under flight paths and is not within the 55 decibel line. There are no unfavorable easements or encroachments on the tract. The site contains a lake approximately 28 acres in size (if floodplain areas are included). The tract is zoned R-4, allowing residential lots of 1/4 acre in size. Raleigh City water, sewer, trash collection, police and fire protection are available.

According to the appraiser of taxpayers, both the neighborhood and the tract "possess the needed attributes to support [single-family] residential development, that is ease of access, availability of utilities,

**IN RE APPEAL OF PARSONS**

[123 N.C. App. 32 (1996)]

favorable topography, and compatibility with the surrounding properties." The parties stipulated that the tract's highest and best use was for residential development.

As of 1 January 1992, Wake County's initial valuation of the tract was $4,684,000. Taxpayers timely appealed this valuation to the Wake County Board of Equalization and Review (the Board), and the Board reduced the valuation of the tract to $3,376,856. The land was assessed at $3,289,975, or $16,892 per acre; a dwelling located on the property was assessed at $86,881. Of the sixteen other parcels of undeveloped real property in Wake County which have 100 or more acres zoned R-4, the comparable parcels were valued between $2,209 and $13,969 per acre, nevertheless, the county valued the Parsons-Price tract at $16,892 per acre. Taxpayers appealed Wake County's decision to the Property Tax Commission. They contended that the true value of the tract on 1 January 1992 was $1,900,000 with no value for improvements.

At the hearing, taxpayers presented testimony of two expert witnesses. Wake County presented testimony of one expert witness. Taxpayers' expert witness in real estate appraising and subdivision analysis was Robert S. Martin (Martin). He testified that he is the owner and president of Martin & Associates, an appraisal company in Winston-Salem, North Carolina, and that he prepared taxpayers' appraisal report of the tract. Martin testified that he had been a certified real estate appraiser for nineteen years. He also testified that he was the author of a book entitled Subdivision Analysis which is used by real estate appraisers to value subdivision property, and the creator of a computer software program designed to aid and assist in valuing subdivision real property. Martin was accepted by the Commission without objection as an expert in "real estate appraising and subdivision analysis."

Martin retained the engineering firms of Jerry Turner & Associates (Turner) to prepare a subdivision site plan, and Bass and Kennedy to prepare a projection of development costs for the site plan. Turner's site plan included areas designated as a lake, greenways and buffers.

Martin testified that he inspected the tract on three different occasions prior to valuing the property. He prepared a report using two different valuation methods—the sales comparison approach and the development approach. Martin did a sales comparison approach which used five comparable sales from August 1986 to December

**IN RE APPEAL OF PARSONS**

[123 N.C. App. 32 (1996)]

1991 and ranging in size from 160 to 563 acres. He testified that the effective date of valuation, 1 January 1992, required sales comparables which occurred prior to the effective date because "if we were doing that correctly, we wouldn't have information past that date." Martin also testified that it was not the standard and accepted practice to use sales occurring after the effective date unless "we really have no other choice." These parcels were valued from a low of $10,900 per acre to a high of $13,002 per acre. Martin made various adjustments to account for differences in topography, location, size, shape and availability of utilities. After making the necessary adjustments, Martin determined that the indicated value per acre using the sales comparison approach was $12,000, for a total value of $1,998,696. Martin did not rely on this approach exclusively for his final valuation of the property and opined that the development approach was "significantly more reliable."

Using the development approach, Martin compared proposed finished lots to be located in a subdivision on the subject property with sales of similarly sized lots in similar subdivisions. Martin testified that he had a site plan prepared for the property and an engineer prepared projected development costs. Martin took into account the topography of the property, including a lake with a dam, creek and "depressions" which were "below the level of the lake" and the creek. He also accounted for a "greenway," which he testified was an undeveloped buffer zone required to be set aside when developing residential property such as that at issue in the instant action.

Martin determined that the highest and best use for the property was one-half acre lots. He also determined that the property would best support 186 such half-acre lots, based on the topography and location of the land. Martin testified that half-acre lots preserved the wooded land and character of the property and decreased development costs. Martin also noted that the property in the immediate vicinity was composed of half-acre to three-quarter acre lots. Wake County claims that Martin rejected developing the tract at R-4 density for aesthetic reasons.

Martin's projected site plan was based on an average price of $45,645 for each of the 186 lots. After making the necessary deductions for the costs of development, Martin valued the subject property, using the development approach, at $1,900,000. Martin contrasted his lot density with that of Wake County, which projected 383 lots of .36 acres each. Martin noted that the maximum number of lots

IN RE APPEAL OF PARSONS

[123 N.C. App. 32 (1996)]

that the property could support was 340, and testified that he did not believe Wake County's projection was "possible." Martin also testified that the average lot size in Wake County was .415 acre, and that sixty-six percent of all Wake County lots were larger than .4 acre. Seventy-six percent were larger than .36 acre.

Martin also testified that Wake County's projected price per .36 acre lot, $35,000, was unreasonably high. Martin's research showed that, even assuming that 383 lots were feasible, the statistical information demonstrated an average price per lot of no more than $32,120. Martin's evidence further showed that Wake County failed to account for the higher development costs (including "water, sewer and streets") which would accompany the denser development of 383 lots.

John P. Arenas (Arenas) was the second witness for taxpayers. His property evaluation report assessed the development and investment potential of the tract. Arenas determined the total number of lots by calculating the maximum number allowed by R-4 zoning (696.5 lots) and subtracting acreage for the lake, private roads (12 acres) for a maximum of 582 buildable homesite lots. He then calculated the present value as of 1 January 1992 to be $1,732,475 based on 58 lots sales per year, at $15,000 per .25 acre lot, despite taxpayers uncontradicted evidence that .28 acre lots in nearby subdivisions were selling for $30,000 each in 1991.

By contrast, Wake County's appraiser and sole expert witness Ken McArtor (McArtor), who initially valued the property at $4,684,000 purportedly based on the sales comparison approach, conceded that he was not licensed as an appraiser of real property in North Carolina or any other state in the United States and that he had never appraised an undeveloped tract of land in Wake County greater than 100 acres. McArtor further admitted that he had never visited the property prior to December 1992, almost one year after he valued it.

McArtor also admitted that the valuation in question was performed as part of a mass appraisal using a computer program. McArtor maintained that he performed certain calculations to adjust the computer program and "narrow things down," but testified that he had no worksheets to show his "refinement[s]" in this regard. McArtor conceded, but failed to offer an explanation for the $1.3 million difference between his appraisal and the Board's original valuation. He also conceded that he made no adjustments for the topography, slope or shape of the property. He did, however, perform a

market study with regard to absorption rates for development. He also admitted that all but one of his comparable sales occurred after the appraisal date of 1 January 1992. Moreover, McArtor conceded that "the sales used in the appraisal was [sic] to support the value, and the value had already been set before those sales took place."

McArtor testified that his comparable sales occurred as late as 1994, two years after the property was valued and that he included as "comparable sales," property which was not zoned R-4. Wake County's appraiser admitted that three of the comparables he used had designations of R-6, R-8 and R-12 and that these designations reflected higher density development. The appraiser also testified that two of his comparable sales were in the Cary area, which was "the hottest area" in Wake County, and that he did not make an adjustment "for the hot area." When questioned with regard to his failure to take these various statutory factors into account, McArtor replied that "the opinion of value had already been determined. . . ."

McArtor testified as to six comparable Wake County sales of tracts 45 acres to 154 acres in size between July of 1990 to March of 1994, noting that the comparable sales adjusted for size and time supported a market value of $3,376,856. To support Wake County's comparable sales valuation, McArtor utilized a development method model of land valuation using identical information and calculations to that used by Arenas, except using a 52 lot per year sales rate (a lower absorption rate than Arenas' 58 per year), larger lot sizes (.36 acre, a size commonly purchased in nearby subdivisions in 1991) and a per lot price supported by taxpayers' comparables of $35,000 per lot (approximately $100,000 per acre) with no premium for lakefront lots. This development approach model yielded a market value of $3,233,649 for the tract.

At the close of the evidence, the Commission Representative ruled that Martin's development model, which offered 187 half-acre lots selling at a rate of 31 per year over 6 years provided the best estimate of value, $1,900,000 ($9,755 per acre).

The Commission made the following findings: that the sales comparison approach of valuation was inappropriate in this case; that taxpayers' residential development approach was the best method for valuing the tract; and that "the property is most suited for 186 half-acre lots with an average lot sales price of $45,645." Wake County appeals.

We note at the onset that appellant's brief is in violation of the North Carolina Rules of Appellate Procedure, specifically Rule 28(b)(5) which states that appellate briefs must reference the pertinent assignments of error immediately after the question raised. As appellant Wake County's brief does not comply with Rule 28(b)(5), it may be deemed abandoned; however, in our discretion we address the merits of Wake County's appeal.

Wake County's first argument is that the Commission erred in rejecting its comparable sales approach valuation. We disagree.

The standard of review of a final order of the Commission is governed by North Carolina General Statutes section 105-345.2, which states:

> (b) So far as necessary to the decision and where presented, the court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional provisions; or
>
> (2) In excess of statutory authority or jurisdiction of the Commission; or
>
> (3) Made upon unlawful proceedings; or
>
> (4) Affected by other errors of law; or
>
> (5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted; or
>
> (6) Arbitrary or capricious.
>
> (c) In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party and due account shall be taken of the rule of prejudicial error. . . .

N.C. Gen. Stat. § 105-345.2 (1995). Thus, a review of the Commission's decision requires this Court to review the whole record. *See In re McElwee*, 304 N.C. 68, 283 S.E.2d 115 (1981). The Court must decide

all relevant questions of law *de novo*, and review the findings, conclusions and decision to determine if they are affected by error or are unsupported "by competent, material and substantial evidence in view of the entire record." *In re Appeal of Perry-Griffin Foundation*, 108 N.C. App. 383, 393, 424 S.E.2d 212, 218, *disc. review denied*, 333 N.C. 538, 429 S.E.2d 561 (1993) (quoting N.C. Gen. Stat. § 105-345.2).

Other established principles to be employed by this Court in reviewing a decision of the Commission include the following:

> (1) a reviewing court is not free to weigh the evidence presented to an administrative agency and substitute its evaluation of the evidence for that the agency; (2) ad valorem tax assessments are presumed to be correct; (3) the correctness of tax assessments, the good faith of tax assessors and the validity of their actions are presumed; and (4) the taxpayer has the burden of showing that the assessment was erroneous. . . .

*In re McElwee*, 304 N.C. at 75, 283 S.E.2d at 120 (citations omitted). However, the presumption that Wake County's assessment was correct is rebuttable.

> [I]n order for the taxpayer to rebut the presumption [of correctness] he must produce "competent, material and substantial" evidence that tends to show that: (1) Either the county tax supervisor used an *arbitrary method* of valuation; or (2) the county tax supervisor used an *illegal method* of evaluation; AND (3) the assessment *substantially* exceeded the true value in money of the property. Simply stated, it is not enough for the taxpayer to show that the means adopted by the tax supervisor were wrong, he must also show that the result arrived at is *substantially* greater than the true value in money of the property assessed, i.e., that the valuation was *unreasonably high*.

*Id.* If a taxpayer is able to produce

> evidence that the appraisal methods used . . . would not produce true values . . . and that the values actually produced by these methods were substantially in excess of true value, [he has] rebutted the presumption of correctness. The burden of going forward with evidence and of persuasion that its methods would in fact produce true values then rest[s] with the [county]. And it bec[omes] the Commission's duty to hear the evidence of both sides, to determine its weight and sufficiency and the credibility of witnesses, to draw inferences, and to appraise conflicting and

circumstantial evidence, all in order to determine whether the [county] met its burden.

*In re Southern Railway,* 313 N.C. 177, 182, 328 S.E.2d 235, 239 (1985) (citing *In re McElwee,* 304 N.C. at 86-87, 283 S.E.2d at 126-27). Further, the Commissioner's findings of fact and conclusions of law are final if after a "review of the whole record they are supported by competent, material and substantial evidence." *In re Appeal of Lee Memory Gardens,* 110 N.C. App. 541, 545, 430 S.E.2d 451, 453 (1993).

At this juncture, we reiterate that it is the function of the administrative agency to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence. We cannot substitute our judgment for that of the agency when the evidence is conflicting.

*In re McElwee,* 304 N.C. at 87, 283 S.E.2d at 126-27 (citing *Comr. of Insurance v. Rate Bureau,* 300 N.C. 381, 269 S.E.2d 547, *reh'g denied,* 301 N.C. 107, 373 S.E.2d 300 (1980)). A review of the whole record reveals that the Commission's decision was supported by substantial evidence.

Property in North Carolina is subject to taxation based on its "true" or fair market value. N.C. Gen. Stat. § 105-283 (1995). North Carolina General Statutes section 105-317 sets out the schedules, standards and rules upon which the value of real property is determined:

(a) Whenever any real property is appraised it shall be the duty of the persons making appraisals:

(1) In determining the true value of land, to consider as to each tract, parcel, or lot separately listed at least its advantages and disadvantages as to location; zoning; quality of soil; water-power; water privileges; dedication as a nature preserve; mineral, quarry, or other valuable deposits; fertility adaptability for agricultural, timber-producing, commercial, industrial, or other uses; past income; probable future income; and any other factors that may affect its value except growing crops of a seasonal or annual nature.

. . .

(b) In preparation for each revaluation of real property required by G.S. 105-286, it shall be the duty of the assessor to see that:

**IN RE APPEAL OF PARSONS**

[123 N.C. App. 32 (1996)]

(1) Uniform schedules of values, standards, and rules to be used in appraising real property at its true value and at its present-use value are prepared and are sufficiently detailed to enable those making appraisals to adhere to them in appraising real property.

. . .

(3) A separate property record be prepared for each tract, parcel, lot, or group of contiguous lots, which record shall show the information required for compliance with the provisions of G.S. 105-309 insofar as they deal with real property, as well as that required by this section. (The purpose of this subdivision is to require that individual property records be maintained in sufficient detail to enable property owners to ascertain the method, rules, and standards of value by which property is appraised.)

(4) The property characteristics considered in appraising each lot, parcel, tract, building, structure and improvement, in accordance with the schedules of values, standards, and rules, be accurately recorded on the appropriate property record.

N.C. Gen. Stat. § 105-317 (1995). The fair market value of real property for tax purposes is the same as that for condemnation purposes. *Great Northern Railroad Co. v. Weeks*, 297 U.S. 135, 139, 80 L. Ed. 532, 535-36 (1936). In either case, the fair market value is "the highest market price [property] would bring for its most advantageous uses [at the time of taking] and in the foreseeable future." *United States v. Cunningham*, 166 F.Supp. 76, 78 (E.D.N.C. 1958), *rev'd on other grounds*, 270 F.2d 545 (4th Cir. 1959), *cert. denied*, 362 U.S. 989, 4 L. Ed. 2d 1022 (1960). The term "highest and best use," contemplates the most productive and lucrative use of land given the applicable physical, legal and governmental constraints. *See In re Appeal of Belk-Broome Co.*, 119 N.C. App. 470, 474, 458 S.E.2d 921, 923-24 (1995), *aff'd*, 342 N.C. 890, 467 S.E.2d 242 (1996).

Wake County argues that it presented ample evidence of valid comparable sales of undeveloped tracts in the same vicinity as the tract at issue here; that all of the comparables had comparable topography, access to water and sewer, access to a major thoroughfare, the same or similar zoning and comparable locations; and that the dates of sales ranged from July of 1990 to March of 1994. A review of the evidence reveals that Wake County's determination of $3,289,975 was suspect. The evidence shows that Wake County's appraiser had never

appraised an undeveloped tract of land in Wake County of the size at issue in the instant case; that the appraiser admitted that he never visited the property until December 1992, a year after his valuation; that all but one of the comparable sales used in his valuation occurred after the appraisal date of 1 January 1992; that three of the comparables used had designations as R-6, R-8 and R-12, reflecting higher density development (only two were R-4); that he failed to make adjustments for topography, slope or shape; and that Wake County's methodology of using a development approach, although not for the purpose of determining value, but solely for comparison with the sales comparison approach, was inappropriate because Wake County used more lots than was feasible for the property, used a lot sales price that was too high and an absorption rate that was too rapid. Because Wake County's appraiser "built a schedule based on comparables[,]" but failed to relate the schedule to the requisite statutory elements pursuant to North Carolina General Statutes section 105-317(a)(1); it failed to procure a "true value in money." Additionally, Wake County's assessment was an arbitrary valuation which produced a value which was substantially in excess of the true value in money of the assessed property.

Taxpayers presented substantial evidence to rebut the presumption of correctness of Wake County's appraisal. Their evidence showed that the highest and best use of the property given its location, zoning, topography, and other characteristics was residential development with 186 lots of one-half acre each; that their appraiser and expert used two valuation methods (the sales comparison approach and the development approach) which yielded values of approximately $1,900,000 and $1,998,696; and that taxpayers' expert testified that the development approach most closely approximated true value.

Wake County correctly points out that our Courts have held that the development approach is not one of the three methods of appraising property; however, the record shows that taxpayers' appraisers also used the sales comparison approach which further supported valuation. Thus, taxpayers sufficiently met their burden of showing that Wake County used an arbitrary method of valuation which substantially exceeded the "true value in money" of the property. A review of the record reveals that the Commission properly determined the "true value in money" of the tract, and took into account all of the various factors which should be considered by assessors in determining the market value of property for tax purposes pursuant

IN THE COURT OF APPEALS                    43

Affirmed.

Judges WYNN and WALKER concur.