**PENN'S GRANT ASSOCIATES,**
Appellant

v.

**NORTHAMPTON COUNTY BOARD OF ASSESSMENT APPEALS.**

Commonwealth Court of Pennsylvania.

Argued May 18, 1999.
Decided June 22, 1999.

Emil W. Kantra, II, Allentown, for appellant.

David M. Bakenstoe, Easton, for appellee.

Before SMITH, J., PELLEGRINI, J., and RODGERS, Senior Judge.

PELLEGRINI, Judge.

Penn's Grant Associates (Taxpayer) appeals from an order of the Court of Common Pleas of Northampton County (trial court) finding that it had failed to provide any competent, relevant evidence to reverse the assessment placed on lots contained in Phase I of a Planned Residential Development (Development). Additionally, it appeals the amount by which the trial court reduced the tax assessment on Phas-

es II – IV of the Development contending that the trial court improperly failed to take into consideration "indirect marketing costs" in applying the developmental approach to market value.

In August 1994, Taxpayer received the approval of the Township of Palmer (Township) to subdivide 69.37 acres of real property for a proposed development involving the construction of town homes, twin homes and single-family homes to be completed progressively in six phases. Phases I – IV are at issue in this appeal. Soon after receiving this initial approval, Taxpayer began to improve each of the 46 lots in Phase I by excavating and staking out individual lots, placing water and sewer connections in the ground and adding some curbing.[1] However, because Taxpayer did not plan to add the final improvements to bring the lots to their full market value until the subdivision was nearly complete, and as they were making improvements gradually, the subdivision improvements relevant to individual lots were in various states of completion.

Although prior to the subdivision the 69.37 acres had previously been given a single assessment, once Taxpayer began to make subdivision improvements in each phase, the Northampton County Assessor's Office (Assessor's Office) began to assess the property by each individual lot rather than as a single parcel.[2] In assessing each lot separately, the Assessor's Office determined its fair market value, then reduced that amount by a standard 25% deduction and applied the 50% assessment ratio to arrive at a final assessment value

for each lot ranging from $11,700—$14,700.[3]

Taxpayer appealed the assessments of all of the lots in each of the four phases to the Northampton County Board of Assessment Appeals (Board). As a result of the appeal, the Board reduced the assessment for the lots in all of the phases to a range between $9,000—$12,000 per lot. Not satisfied with the amount of the reduction, Taxpayer appealed to the trial court contending that the assessment method used was invalid because it did not measure the fair market value of the entire phase as it applied a standard 25% deduction to each lot instead of deducting a value representing the level of completion for each phase. The appeals of the four phases were then consolidated at the trial court.

Before the trial court, the Board introduced the official assessment record which was not made by the value of a particular lot but by individual lots in each of the phases. The Board then presented the testimony of the Northampton County Assessment Manager who described how the county individually assessed the value of the lots in each phase, then reduced the fair market value by 25%, an arbitrary allowance applied county-wide to improved lots in new subdivisions in order to account for their incomplete status.

In response, Taxpayer presented the testimony of Margaret Dissinger, its Director of Development, to testify as to the status of the completion of improvements relevant to each subdivision. She testified that Phase I was 20% incomplete, Phase II was 77% incomplete, Phase III was 78%

1. Taxpayer began improving the lots before the final subdivision approval was recorded on May 22, 1995.

2. Taxing authorities may reassess the value of property when improvements are added pursuant to Section 2 of the General County Assessment Law, Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. 5347.1, which states in pertinent part:

The subordinate assessors may change the assessed valuation on real property when a

parcel of land is divided and conveyed away in smaller parcels or when improvements are made to real property or existing improvements are made from real property or are destroyed[.]

3. The range of assessed value of the individual lots in Phases II—IV mirrors that of Phase I. The final subdivision approval for these phases are as follows: Phase II was recorded on December 28, 1995; Phase III was recorded on May 24, 1996; and Phase IV was recorded on April 25, 1997.

incomplete, and Phase IV was 90% incomplete, making the 25% discount rate to each lot invalid as not reflective of the actual fair market value of the entire phase. Having focused on the status of the entire acreage in each phase, she did not testify to the level of completion of the individual lots in Phase I and did not specifically dispute that the 25% deduction was invalid as applied to individual lots in that phase.

As to how much each phase should be assessed, Taxpayer presented the testimony of Deborah Skeans, a licensed real estate appraiser. In arriving at her valuations, she did not appraise each individual lot. Instead, she used the development approach to value, which placed a value on the raw acreage to be developed, not on the individual lots. She testified that she used that method because it more accurately reflected the actual completion rate for an entire phase by reducing the total fair market value of a phase by the direct costs and indirect costs required to complete the improvements. Applying this methodology to the status of the phases before any lots were sold, Skeans testified that the valuations should have been $725,-000 for Phase I, $910,000 for Phase II, $530,000 for Phase III and $670,000 for Phase IV. While no individual lots were sold from Phases II – IV, she did testify that individual lots had been sold from Phase I so that only 23 lots remained unsold in that phase.

The trial court found initially that the appropriate method of valuation of the property had to be determined, i.e., whether by individual lot or by phase; if a lot had been sold in a particular phase, each individual lot in that phase had to be valued and assessed separately and that particular phase could no longer be assessed as a unit. Because lots had been sold in Phase I, and Taxpayer valued the remaining lots in Phase I as a whole, the trial court found that it had failed to present competent, relevant evidence to overcome the assessment made for the individual lots in Phase I. Correspondingly, because no lots had been sold from Phases II – IV, the trial court accepted Taxpayer's development approach of valuation but did not allow a deduction of indirect costs, such as marketing and taxation, finding them unrelated to the completion of improvements. Only Taxpayer appealed the trial court's order.[4]

## I.

Taxpayer contends that the trial court erred in finding that an assessment had to be made on every individual lot in Phase I once a lot was sold; it contends that only those lots that were sold were subject to an individualized assessment, and the rest of Phase I should have been assessed as a whole under the developmental approach. As a result, it contends that the trial court should be reversed because it offered competent evidence to overcome the assessment placed on Phase I of the property.[5]

4. In a tax assessment case, the trial court hears the evidence *de novo* and our standard of review is limited to a determination of whether the trial court abused its discretion, committed an error of law, or whether its decision is supported by substantial evidence. *RAS Development Corporation v. Fayette County Board of Assessment Appeals*, 704 A.2d 1130 (Pa.Cmwlth.1997).

5. In tax assessment appeals, the Board establishes the *prima facie* validity of its assessment by placing into evidence the official assessment record. *See North Park Village, Inc. v. Board of Property Assessments, Appeals*

*and Review of Allegheny County*, 408 Pa. 433, 184 A.2d 253 (1962). Once the assessment record is entered into the record at trial, the burden shifts to the taxpayer to come forward with competent, relevant evidence that the assessment was incorrect, arbitrary and in disregard of the owner's rights in order to overcome the assessment's *prima facie* validity, and only then does the taxpayer carry the burden of persuasion as to the appropriate methodology. *Id.* For some reason, the hearing did not proceed in this manner, with the Board proceeding with its evidence after it introduced its assessment record.

In *Kraushaar v. Wayne County Board of Assessment and Revision of Taxes*, 145 Pa.Cmwlth. 314, 603 A.2d 264, *petition for allowance of appeal denied*, 531 Pa. 649, 612 A.2d 986 (1992), the case relied on by the trial court in finding that Taxpayer's expert did not use the correct method of appraising Phase I, we addressed whether the lots that were sold from a subdivision should only be individually assessed while the remaining lots continued to be assessed as one single unit under Section 602.1 of The Fourth To Eighth Class County Assessment Law (Assessment Law), 72 P.S. § 5453.602a. That section provides, in pertinent part, that:[6]

> The board may change the assessed valuation on real property when (i) a parcel of land is divided and conveyed away in smaller parcels, or (ii) when the economy of the county or any portion thereof has depreciated or appreciated to such extent that real estate values generally in that area are affected, and (iii) when improvements are made to real property or existing improvements are removed from real property or are destroyed.

As here, the developers in *Kraushaar* interpreted this provision to mean that only the lots which were sold from the subdivided property or specifically improved were subject to reassessment, but not the lots that remained. We held, however, that by doing so, they misinterpreted the language of this provision, stating:

> In enacting Section 602.1, the General Assembly recognized that the assessed value of the subdivided property does not automatically increase merely be-

cause it is subdivided. By adding a requirement that prior to being reassessed that one of the lots is to be conveyed or improvements had to be made, the General Assembly recognized that the sale of a lot would establish the property's market value and any improvement, even to only a portion of the parcel, would have an effect on the value of the remaining parcels, thereby warranting that each lot be reassessed up or down. The General Assembly expressed a similar sentiment in Section 513(b) of the Pennsylvania Municipalities Planning Code, 53 P.S. §§ 10513(b), by providing:

> > The recording of the plat [subdivision] shall not constitute grounds for assessment until such time as lots are sold or improvements are installed on the land included within the subject plat.

> Both of these provisions indicate the intent of the General Assembly to forbear reassessing property merely because it has been subdivided, but once there has been a change in condition of the property, i.e., such as a sale or improvement, to allow a reassessment of each new lot to occur.

603 A.2d at 265 (footnotes omitted).[7]

As the trial court held, once lots were sold from Phase I, that phase had to be assessed on an individual lot basis; evidence needed to overcome the assessment had to challenge the value and give a value to the individual lot, not the entire phase.[8] Because Taxpayer only presented evidence as to the value of the entire phase and not

---

6. While *Kraushaar* addressed the impact of Section 602.1 of the Assessment Law, 72 P.S. § 5453.602a, Section 6 of the Third Class County Assessment Law applicable to Northampton County, 72 P.S. § 5347.1, contains an identical provision.

7. We also held that assessing only sold lots would result in a situation that was unconstitutional under the uniformity requirement of Article IX, Section 1 of the Pennsylvania Constitution which requires that "[a]ll taxes shall be uniform, upon the same class of subjects,

within the territorial limits of the authority levying the tax" because identical lots that had not been sold would have been taxed at a different assessment value.

8. While the trial court may have distinguished Phase I from Phases II – IV based on the sale of lots from Phase I, Section 513(b) of the Assessment Law also specifically makes improvements a triggering event. However, because the validity of Taxpayer's challenge to those assessments is not before this Court on appeal, we need not address that issue.

for the individual lots, it did not, as the trial court found, offer sufficient evidence to overcome the Board's assessment for that phase.[9]

## II.

As to Phases II – IV, Taxpayer contends that the trial court erred in disallowing the deduction of indirect costs—such as legal, accounting, insurance, marketing and taxes—in order to arrive at the market value of the lots based on the developmental approach simply because it found them unrelated to the completion of the improvements. It contends that because such costs would be relevant if an incomplete phase were sold in bulk to a developer and the costs are unique to a subdivision, the trial court should have found them relevant to the fair market value of those phases.

The "development approach" is an approach used to value multiple unimproved lots in a subdivision or potential subdivision as a unit. It has also been referred to as the "cost of development method;" the "anticipated use method;" the "lot method;" the "developer's residual approach;" the "developer's absorption method;" and the "subdivision approach." Under this method of assessment, the expected sale prices of the lots are considered and direct and indirect development and marketing costs are also considered in order to find true market value.[10] Although the development approach is most often used to determine market value for raw land that is not yet subdivided, where the land's best use is that of a residential subdivision, it is also used when the land is already fully subdivided. *See* Eaton, *supra* at note 11.[11]

9. Because Taxpayer failed to meet its burden to challenge the validity of the assessment method as it presented only evidence appraising each phase, we need not reach the issue of whether the method of applying a standard 25% deduction to each lot in Phase I without accounting for the actual degree of completion for each lot was appropriate.

10. In applying the development approach to raw land that is not yet fully subdivided, the procedural steps generally used by appraisers are as follows:

1. Prepare subdivision layout to determine number, size and shape of typical lots.
2. Estimate retail value of lots.
3. Estimate direct development costs.
4. Estimate indirect development costs.
5. Compute income residual to developer's profit and land (Step 2 minus Steps 3 and 4).
6. Deduct developer's profits from Step 5.
7. Estimate the amount of time required to develop and sell out the subdivision.
8. Discount anticipated income stream into a current indicated raw land value.

J.D. Eaton, REAL ESTATE VALUATION IN LITIGATION 223 (Amer. Inst. of Real Estate Appraisers 1982). Where the land has been subdivided, step 1 is unnecessary and makes the figures obtained from steps 2, 3, 4 and 7 more reliable. For land that has been fully subdivided, the problems involved with the partially developed subdivision evaporate because the costs to the developer are no longer

speculative, the value of the individual lots in the market may be ascertained with as much certainty as in any other condemnation proceeding, and the possibility of the property's use is no longer remote. Eaton, *supra*, at 212.

11. While the developmental approach to assessing property has been accepted by many courts as an appropriate valuation method, *see, e.g., Clifford v. Algonquin Gas Transmission Co.*, 413 Mass. 809, 604 N.E.2d 697 (1992); *Robinson v. Town of Westport*, 222 Conn. 402, 610 A.2d 611 (1992); *Ramsey County v. Miller*, 316 N.W.2d 917 (Minn. 1982); *U.S. v. 147.47 Acres of Land in Monroe County*, 352 F.Supp. 1055 (M.D.Pa.1972), many other jurisdictions exclude the developmental approach for valuing undeveloped property as too speculative because of problems inherent to the approach, including the susceptibility to error caused by the large number of variables, the difficulty in accurately predicting when lots will sell so that the best anyone can do is to make a "reasonable" guess, the unknown nature of the expenses incurred in developing the property which then must be estimated, and the discount factor applied to the estimated cash-flows must be estimated so that it is subject to disagreement. *Oklahoma v. Panell*, 853 P.2d 244 (Okla. Ct.App.1993); *City of Tulsa v. Biles*, 360 P.2d 723 (Okl.1961); *Travis Central Appraisal District v. F.M. Properties Operating Co.*, 947 S.W.2d 724 (Tex.App.1997).

Assuming the developmental approach is an allowable method to assess the value of Phases II – IV,[12] and the Board has not contended it is not, because indirect costs are an accepted item of expense in using this approach, the trial court was required to take into consideration the indirect costs related to development of lots in each phase when arriving at an opinion of value that was used as the basis of the assessment.

Accordingly, this case is remanded to the trial court to take into consideration the indirect costs in valuing Phases II – IV, but is affirmed as to Phase I because Taxpayer failed to present evidence to rebut the *prima facie* validity of the assessment.

### *O R D E R*

AND NOW, this 22nd day of June, 1999, the order of the Court of Common Pleas of Northampton County dated November 24, 1998, is affirmed in part and reversed in part. The case is remanded to the trial court to take into consideration the indirect costs in valuing Phases II – IV, but is affirmed as to Phase I because Taxpayer failed to present evidence to rebut the *prima facie* validity of the assessment.

Jurisdiction is relinquished.

12. We note that Section 4 of the General County Assessment Code, 72 P.S. § 5020–402, only provides that in arriving at a value, three methods are to be used in the assessment process; namely, cost (reproduction or replacement), comparable sales and income approaches, and are to be considered in conjunction with one another. In other jurisdictions, courts have not permitted the application of the development approach for assessment of value when that method is not listed in the statute. *See In Re Parsons*, 123 N.C.App. 32, 472 S.E.2d 182 (1996).