**In Re: CONDEMNATION OF 23.015 ACRES MORE OR LESS KNOWN AS TAX MAP Parcel No. 15–29–129 Lands N/L.**

**Appeal of: Robert L. and Maryanne P. Showalter.**

Commonwealth Court of Pennsylvania.

Argued Nov. 15, 2005.
Decided Feb. 28, 2006.
Reargument Denied April 21, 2006.

---

3. Act of June 26, 1931, P.L. 1379, *as amended.*

Robert W. Gundlach, Jr., Warrington, for appellants, Robert L. and Maryanne P. Showalter.

Jay H. Karsch, Doylestown, for appellee, Pennridge School District.

BEFORE: PELLEGRINI, Judge, and LEAVITT, Judge, and KELLEY, Senior Judge.

OPINION BY Judge LEAVITT.

 Robert L. and Maryanne P. Showalter appeal an order of the Court of Common Pleas of Bucks County (trial court) denying their motions for post-trial relief.[1] By their motion, the Showalters requested the trial court to set aside a jury award of $325,000 for property taken through condemnation by Pennridge School District (Pennridge). The principal issues on appeal concern certain evidentiary rulings by the trial court, which the Showalters believe constituted reversible error. The Showalters also challenge the trial court's assessment of delay damages and attorney's fees. We reverse and remand for a new trial.

The Showalters are the former owners of a 23.015 acre vacant parcel of land (Property) located adjacent to Pennridge's property in Hilltown Township, Bucks County. The Showalters purchased the Property in 1988 for investment purposes. In 1998, when the Showalters anticipated needing money for their children's college expenses, they retained the services of Mr. Showalter's engineering firm, Robert L. Showalter & Associates, to prepare preliminary plans to subdivide the Property into four large residential "estate" lots. The plans were submitted to the Hilltown Township Planning Commission at a public meeting in June, 1998.

At around the same time, the Showalters entered into discussions with officials at Pennridge about its potential purchase of the Property. At the time, Pennridge was a long-standing client of Mr. Showalter's firm. These discussions culminated in an exchange of documents that are relevant in this appeal. The first was a letter from Pennridge's counsel to its realtor, dated July 2, 1999, contemplating the sale of the Property. Attached to the letter was a draft "Settlement Agreement" between the Showalters and Pennridge; a proposed agreement of sale listing a purchase price of $280,000; and a draft of a school board resolution to condemn the Property. Reproduced Record 550a–565(a)a (R.R. ———). A second letter, dat-

1. At the outset, we note that an appeal will lie only from a final order, unless otherwise permitted by rule or by statute. *In re H.S.W.C.-B*, 575 Pa. 473, 475, 836 A.2d 908, 909 (2003). An appeal from an order denying post-trial motions is interlocutory. PA. R.A.P. 301(a), (c) and (d). Thus, it follows that an appeal to this Court can only lie from a judgment entered subsequent to the trial court's disposition of any post-trial motions. In this case, it appears from the certified docket entries that judgment was never entered on the jury's verdict. Although we could quash the appeal on jurisdictional grounds, we decline to do so since the order from which the appeal was taken was "clearly intended to be a final pronouncement on the matters" at issue in this case. *Fanning v. Davne*, 795 A.2d 388, 391 (Pa.Super.2002). Were we to quash the appeal, we would needlessly expend judicial resources on the decision to quash, and, moreover, the appellants would inevitably praecipe the prothonotary to enter judgment and a subsequent appeal would follow. Thus, in the interests of judicial economy, we shall "regard as done that which ought to have been done" and consider this appeal as being properly before our Court. *Id.* at 392.

ed November 23, 1999, from Pennridge to the Showalters enclosed the draft Settlement Agreement; a revised agreement of sale listing a purchase price of $260,000; and a draft copy of the condemnation resolution. The Showalters responded to Pennridge's November 23, 1999, communication with a memo dated December 15, 1999, proposing changes to the Settlement Agreement and the revised agreement of sale.

When the negotiations between the parties failed to yield an agreement of sale by the spring of 2000, the Showalters resumed their subdivision plans while Pennridge moved forward with its plans to acquire the Property by eminent domain. To that end, Pennridge filed a declaration of taking on November 3, 2000, condemning the Property. The Showalters petitioned for appointment of a Board of View to determine just compensation. On January 29, 2001, a view and hearing was held before the Board of View, and on April 18, 2002, it issued a Report and Award valuing the Property at $340,000. The Showalters appealed to the trial court and the parties proceeded to a jury trial on July 12, 2004.

Prior to trial, the Showalters filed a motion in limine to exclude all testimony and other evidence regarding their pre-condemnation negotiations with Pennridge regarding a sale of the Property. On the first day of trial, before the jury was seated, the trial court denied the Showalters' motion and admitted into evidence the above-described documentation of the parties' negotiations. The parties also offered testimony regarding their divergent recollections of the negotiations. Pennridge's witnesses testified that an employee of the Showalters approached the school district with an offer to sell the Property in the spring of 1999, and they indicated their willingness to sell the Property for $260,000. Pennridge argued that it reached a "handshake deal" with the Showalters on November 15, 1999, to acquire the Property for $260,000, as was reflected in the proposed agreement of sale that was prepared by the school district and sent to the Showalters on November 23, 1999. Pennridge disavowed that it had any intent at that point to condemn the Property and characterized the condemnation resolutions as a "friendly condemnation," designed to avoid payment of the 2% realty transfer tax.

The Showalters denied that they approached Pennridge first; they argued that Pennridge became aware of the availability of the Property when the Showalters submitted their subdivision plans to the Planning Commission in June of 1998. Pennridge then offered the Showalters $280,000 in its first set of documents. The Showalters further testified that they never accepted Pennridge's second offer of $260,000 and, in support, noted that they never executed an Agreement of Sale. The Showalters denied that they ever reached a "handshake deal" with Pennridge.

On the second day of trial, Pennridge made an oral motion to exclude certain aspects of an expert valuation report the Showalters intended to offer into evidence. This report, prepared by the Showalters' real estate appraiser, used both the "sales comparison approach" and the "subdivision development method" in affixing the value of the Property.[2] Penn-

---

2. The "sales comparison approach" is sometimes referred to as the "market data approach," under which the appraiser theorizes that if a similar property located in similar surroundings sold recently at a given price, the price is relevant in predicting the market value of the property being appraised. In *In re Appeal of Avco Corporation,* 100 Pa. Cmwlth. 616, 515 A.2d 335, 338 (1986), this

ridge specifically objected to the "subdivision development method" portion of the expert report and any evidence referring to the value of individual lots in a proposed subdivision. The Showalters opposed the motion. They pointed out that Pennridge was violating the trial court's directive to make all such motions in advance of the trial. They also argued that by filing the motion in the middle of the trial, Pennridge was prejudicing Showalters' case presentation.

The trial court initially denied Pennridge's motion but, on the third day of trial, reversed itself. In its new order, the trial court made several critical rulings. First, it directed the Showalters to redact the inadmissible portions of their expert appraiser's report. Second, the Showalters were directed not to elicit testimony from their expert on the value of the Property as a residential subdivision. Third, the Showalters were barred from offering correspondence between the parties that referred to the Property's value as falling between $500,000 and $600,000; further, they were prohibited from eliciting testimony about these letters or their contents. Fourth, Showalters' counsel was required to correct his opening remarks to the jury that he would present evidence of both the comparable sales and the subdivision development valuation methods. The Show-

alters' expert was permitted to testify that the fair market value of the Property was $650,000, using only the comparable sales methodology. Finally, Mr. Showalter, in his capacity as Property owner, but not as an expert engineer, was permitted to testify that, based upon his personal belief that the Property could be subdivided into twelve residential lots, its value was $690,000.

Pennridge rebutted the Showalters' valuations with the testimony of their real estate appraiser setting a fair market value for the Property of $265,000, based upon comparable sales. Pennridge also offered the testimony of two engineers who concluded that the Showalters would encounter difficulty in obtaining approval from local planning authorities for their proposed subdivision plan. Pennridge's appraiser agreed that the highest and best use of the Property is residential development, but limited the subdivision to four lots.

█ On July 15, 2004, the jury announced a verdict that set the fair market value of the Property on the date of taking at $325,000. The Showalters filed a motion for a new trial, arguing that the trial court erred by (1) denying their motion in limine to exclude evidence of the parties' pre-condemnation negotiations; and (2) ex-

---

Court explained the elements of the sales comparison method:

[T]his is not an exact science, and since no two properties are exactly alike, an expert must make adjustments to the sale price of the comparable property to aid him in forming an opinion. The adjustments may be as to time, condition, locality and size. Properties may be similar for comparison purposes without being identical, and the difference goes to the weight, i.e., the persuasive quality, of the expert's testimony. Of course, the weight accorded to an expert's testimony is for the fact finder to determine.

The "subdivision development method" is an approach used to value multiple unimproved lots in a subdivision or potential subdivision as a unit. It has also been referred to as the "cost of development method;" the "anticipated use method;" the "lot method;" the "developer's residual approach;" the "developer's absorption method;" and the "subdivision approach." *Penn's Grant Associates v. Northampton County Board of Assessment Appeals*, 733 A.2d 23, 28 (Pa.Cmwlth.1999). Under this method, the expected sale prices of the lots are considered and direct and indirect development and marketing costs are also considered in order to find true market value. *Id.*

cluding their expert valuation testimony upon Pennridge's late oral motion. The trial court denied post-trial relief on November 16, 2004, and awarded the Showalter's $2,003.54 for delay damages from May 22, 2001, the stipulated date the Property was tendered to the school district, and $500 for appraisal, attorneys' and engineering fees. This appeal followed.[3] On appeal, the Showalters seek a new trial on four grounds. First, the Showalters argue that the trial court erred by admitting evidence of the parties' pre-condemnation negotiations, including Pennridge's offer to purchase the Property for $260,000, which the Showalters rejected. Second, the Showalters contend that the trial court erred by precluding the testimony of their expert appraiser and those portions of his report valuing the Property as a twelve-lot residential subdivision. Third, the Showalters argue that the trial court erred by calculating delay compensation from the date they tendered the Property to Pennridge, since they were deprived of their use of the Property from the date of taking. Fourth, the Showalters contend that the trial court erred in awarding them a flat fee of $500 for appraisal, attorneys' and engineering fees pursuant to Section 610 of the Eminent Domain Code[4] because that statutory provision is unconstitutional.

■ We consider first, whether the trial court erred by admitting evidence of the parties' pre-condemnation negotiations for the sale of Property. The Showalters argue that these negotiations were part of settlement discussions to resolve possible condemnation litigation, and that the two proposed prices of $280,000 and $260,000 were mere offers made by Pennridge, the condemnor, in anticipation of taking the Property by eminent domain. Offers, the Showalters contend, are not admissible in a condemnation.

Pennridge counters that it did not intend to use its eminent domain powers at the beginning of the negotiations; it proposed a "friendly condemnation" only to avoid payment of the 2% realty transfer tax, and, therefore, the negotiations were not part of an attempt to settle impending condemnation litigation. Pennridge views the negotiations as admissible evidence because they were undertaken voluntarily and culminated in a "handshake deal." The trial court accepted Pennridge's characterization of the negotiations and concluded that the price needed in the "handshake deal" was relevant to establishing the fair market value of the Property under Section 705(2)(i) of the Eminent Domain Code.[5] This deal was also appropriate

---

3. Our scope of review of the trial court's ruling on post-trial motions is limited. In general, we will not disturb the trial court's ruling unless the court manifestly abused its discretion or committed an error of law that affected the outcome of the case. *Tedesco v. Municipal Authority of Hazle Township*, 799 A.2d 931, 934 (Pa.Cmwlth.2002). Stated differently, this Court's inquiry is to determine whether the trial court acted capriciously or palpably abused its discretion. *. Id.*

4. Act of June 22, 1964, Sp. Sess., P.L. 84, *as amended;* Section 610 was added by Act of December 29, 1971, P.L. 640, 26 P.S. § 1–610. *See* note 11, *infra,* for text of Section 610.

5. Section 705(2)(i) provides:

(2) A qualified valuation expert may testify on direct or cross-examination in detail as to the valuation of the property on a comparable market value, reproduction cost or capitalization basis, which testimony may include but shall not be limited to the following:

(i) The price and other terms of *any sale or contract to sell* the condemned property or comparable property made within a reasonable time before or after the date of condemnation.

26 P.S. § 1–705(2)(i) (emphasis added).

for challenging Mr. Showalter's credibility.[6] We disagree.

■ It is well-established that offers are generally not admissible in a condemnation proceeding, either on direct or cross-examination. *Tedesco v. Municipal Authority of Hazle Township*, 799 A.2d 931, 934 (Pa.Cmwlth.2002). Offers made by a condemnor and rejected by a condemnee prior to a hearing are never admissible because they measure the settlement value of a case, not the fair market value of the condemned property, and to hold otherwise would discourage settlement of litigation. *Id.* at 935. This rule also discourages a condemnor from making an unreasonably low offer in order to generate favorable valuation evidence in future litigation.

In this case, the two written communications indicate that Pennridge offered the Showalters $280,000 and $260,000 as part of a proposed settlement in advance of condemnation proceedings. One need look no further than the title of the operative document in each communication: "Settlement Agreement." Also, Pennridge's inclusion of draft condemnation resolutions on both occasions indicate that it had every intention of using its power of eminent domain to acquire the Property in the event a settlement was not reached. Pennridge's explanation that it only contemplated a "friendly condemnation" to avoid transfer taxes lacks merit. Pennridge cites to no authority from any court that would allow "friendly condemnors" special exceptions from the rules of evidence applicable in condemnation litigation.

■ Further, evidence of the negotiations and Pennridge's offers is not admissible under the Eminent Domain Code. Section 705(2)(i) of the Eminent Domain Code permits a qualified valuation expert to testify as to the "price and other terms of *any sale or contract* to sell the condemned property ... made within a reasonable time before ... the condemnation." 26 P.S. § 1–705(2)(i) (emphasis added). First, there was no sale or contract to sell the Property in this case. The Showalters never executed an agreement of sale. Pennridge's argument, accepted by the trial court, that it had a "handshake deal" with the Showalters lacks any merit. The very concept of a "handshake deal" for the acquisition of real estate is a clear violation of the Statute of Frauds as codified by our General Assembly. Section 1 of the Act of March 21, 1772, 1 Laws of Pennsylvania 389, 33 P.S. § 1.[7] Moreover, although Section 705(2)(i) may be intended to broaden the permissible scope of testimony in condemnation proceedings, such testimony is "subject to the limitation that neither an expert witness nor the condemnee ... can testify to facts and data which are not judicially relevant and competent." *Scavo*

---

6. The trial court relied upon the direction of the Pennsylvania Supreme Court in *Berger v. Public Parking Authority of Pittsburgh*, 380 Pa. 19, 109 A.2d 709 (1954) that an owner of condemned property may be asked on cross-examination what he paid for the property and the price at which he offered to sell the property if the purchase or sale was not too remote in time. At issue in *Berger*, however, was a written sales agreement executed by the property owner.

7. It states, in pertinent part, that no estates or interests in land "shall ... be assigned, granted or surrendered, unless it be by deed or note, *in writing, signed by the party so assigning, granting or surrendering the same*, or their agents, thereto lawfully authorized by writing." 33 P.S. § 1 (emphasis added). *See also Long v. Brown*, 399 Pa.Super. 312, 582 A.2d 359, 361 (1990) ("The Statute of Frauds instructs that a purported transfer of an ownership interest in real property is not enforceable unless evidenced in writing and signed by the party(ies) granting the interest.").

*v. Department of Highways,* 439 Pa. 233, 239, 266 A.2d 759, 762 (1970) (citations omitted). Evidence of pre-condemnation settlement negotiations is not competent, and Section 705(2)(i) does not alter that principle. Whether the sale is for the same property, or a comparable property, "a settlement with a condemnor is not the type of 'sale or contract to sell' contemplated by the Eminent Domain Code." *Scavo,* 439 Pa. at 240, 266 A.2d at 762–763.

For these reasons, we hold that the trial court committed reversible error in admitting evidence of the pre-condemnation settlement negotiations between the Showalters and Pennridge.

■■■■ The Showalters next assert that the trial court erred by not permitting their expert appraiser to value the Property using the subdivision development method. Although the Showalters' expert valued the Property as a whole in his report, the trial court found that the valuation in that report was premised on the value of twelve individual lots in a proposed, but unapproved, subdivision. The trial court concluded that this valuation evidence is inadmissible for two reasons. First, the Pennsylvania Supreme Court has mandated that a valuation based upon a cumulative value of individual lots is not admissible because it violates the "unit rule." [8] *Rothman v. Commonwealth,* 406 Pa. 376, 178 A.2d 605 (1962). Second, the subdivision development method is inappropriate where no "meaningful steps"

have been taken to subdivide the land into residential lots, such as "construction expenses and actual lot sales." *United States v. 147.47 Acres of Land in Monroe County, Pennsylvania,* 352 F.Supp. 1055, 1061 (M.D.Pa.1972).[9]

A review of the record, including the redacted portions of the Showalters' expert valuation report, demonstrates that use of the subdivision development method was appropriate; the trial court erred in excluding this evidence. The Showalters' expert valued the Property as a whole but arrived at the ultimate value by starting with the values of individual lots and adding and subtracting other values and expenses, calculated over the projected time period needed to subdivide and sell the lots. This method was recognized as appropriate in condemnation proceedings in *Lehigh–Northampton Airport Authority v. Fuller,* 862 A.2d 159 (Pa.Cmwlth.2004), where the value of individual units was considered, but the final value of the property as a whole was derived from a complicated methodology applied to cost, expense and time data; the ultimate value was not merely the sum of the value of the individual units.

*Lehigh–Northampton Airport* relied upon the rationale in the earlier cases of *In re Right of Way for Legislative Route 1046,* 146 Pa.Cmwlth. 344, 605 A.2d 1286 (1992), and *Columbia Gas Transmission Corporation v. Piper,* 150 Pa.Cmwlth. 404,

---

**8.** The so-called "unit rule" prohibits valuations where the individual lots or units are given a value and then, in order to determine the value of the entire property, the values of the individual lots/units are simply added together. *Department of Transportation v. Becker,* 118 Pa.Cmwlth. 620, 546 A.2d 1282, 1285 (1988).

**9.** The trial court quoted the following language in *147.47 Acres of Land,* 352 F.Supp. at 1060 as controlling:

It may well be that even though the highest and best use of a property is for a residential subdivision, if no meaningful steps have been taken in that direction, viz., construction expenses and actual lot sales, then a "lot method" appraisal or a "developer's residual" approach, as it is also known, would be inappropriate.

615 A.2d 979 (1992), wherein this Court confirmed that testimony as to the value of individual units or lots is not a violation of the "unit rule" if the final value of the property is not simply a sum of those individual unit parts. "In using the [subdivision development method] to find the true market value the expected sale prices of the lots are considered as well as the direct and indirect development and marketing cost." *Lehigh–Northampton Airport*, 862 A.2d at 167.

Here, all of the factors added and subtracted to the lot values by the Showalters' expert represented details of his rationale in reaching a valuation; the "pieces of data" were not presented to the jury as separate items of value to be added up to determine the overall value of the Property. The Showalters expert properly applied the subdivision development method to arrive at his valuation of the Showalters' property. The fact that the ultimate value of the Property was substantially lower than the sum of all the lot values demonstrates that the expert did not merely add up the unit lot values to reach the value of the Property as a whole.

*Lehigh–Northampton Airport* also addresses the trial court's second reason for excluding the Showalters' expert testimony, namely that the Showalters had not taken "meaningful steps" to subdivide the Property. In *Lehigh–Northampton Airport* the proposed subdivision plan did not have municipal approval. The trial court admitted evidence of the subdivision development approach to value the condemned land after finding that there was virtually no conjecture as to the reasonable certainty of subdivision and development of the property. The proper foundation for use of the development method was laid by demonstrating "that the land was ripe for development, that their expectation of securing all of the necessary zoning and other required permits was reasonable, and that the development of the property was within the reasonably foreseeable future." *Lehigh–Northampton Airport*, 862 A.2d at 166.

 In this case, the record reveals that the best and most desirable use for the Property was as a residential development. The Showalters also testified that the planning authorities had been favorably disposed to a subdivision of the Property before Pennridge offered to buy it. It is not necessary for the Showalters to prove that all zoning and other permits had been finally secured; under *Lehigh–Northampton Airport* they only had to demonstrate that their "expectation" for approval was reasonable, and that the development was within the "reasonably foreseeable future." *Id.* The trial court prevented the Showalters from offering relevant evidence prepared for the condemnation proceedings, and the Showalters were prejudiced by the exclusion of that evidence.[10]

In sum, while we recognize that a trial court enjoys broad discretion over evidentiary matters, we cannot overlook the errors made by the trial court in this case with respect to the evidence on valuation. The trial court allowed Pennridge to introduce incompetent, and prejudicial, evidence of the parties' pre-condemnation set-

---

10. Pennridge argues that the exclusion of the valuation evidence was not prejudicial to the Showalters because the valuation of the property using the subdivision development method was lower than the value reached by their expert using the comparable sales method. We disagree. The timing of the trial court's evidentiary ruling, the redacted form of the appraiser's report presented to the jury, and the inability of the Showalters to offer expert evidence of their reasonable expectation to subdivide the property all operated to diminish unfairly the Showalters' credibility before the jury.

tlement negotiations and, at the same time, foreclosed the Showalters from offering competent evidence of the value of the Property based upon an accepted methodology. These rulings clearly affected the outcome of the case, and the Showalters were entitled to a new trial on damages. We find that the trial court palpably abused its discretion by denying the Showalters' motion for post-trial relief in the form of a new trial.

In their third issue on appeal, the Showalters contend that the trial court erred by measuring delay compensation as of the date they tendered possession of the Property to Pennridge. The Showalters posit that delay compensation should have been measured from the date Pennridge filed the declaration of taking. In asserting this claim, the Showalters maintain that from the moment the declaration of taking was filed, they were no longer able to pursue their development plan and were thus deprived of their use of the Property.

Section 611 of the Eminent Domain Code, 26 P.S. 1–611, provides in part:

> The condemnee shall not be entitled to compensation for delay in payment during the period he remains in possession after the condemnation. Compensation for delay in payment shall, however, be paid at the rate of six per cent per annum from the date of relinquishment of possession of the condemned property by the condemnee, or if the condemnation is such that possession is not required to effectuate it, then delay compensation shall be paid from the date of condemnation.

Our Supreme Court has interpreted Section 611 to mean that where a declaration of taking deprives a landowner of the full and normal use of his property, as established by the *use to which his property was devoted before the declaration,* the landowner is no longer in possession under section 611. *Hughes v. Department of Transportation,* 514 Pa. 300, 523 A.2d 747 (1987). The effect of Section 611 is to make the condemnee's continued possession an absolute bar to any delay compensation. *Pennsylvania Game Commission v. 21.1 Acres of Land in Washington Township, Butler County,* 61 Pa.Cmwlth. 383, 433 A.2d 915 (1981).

In the present case, the Property was a vacant parcel of land prior to condemnation. This "use," or lack thereof, was unchanged by the taking, and the Showalters' continued possession was likewise unchanged. *See also Pittsburgh North, Inc. v. Department of Transportation,* 514 Pa. 316, 523 A.2d 755 (1987) (rejecting condemnees' argument that they were entitled to delay compensation because they were deprived of their *contemplated* use of vacant land from the date of taking; condemnor's actions did not interfere with the condemnees' full and normal use of the property as vacant land, which was the use to which condemned property had been devoted prior to taking). Delay compensation was properly measured in this case from the date the Showalters tendered the Property to Pennridge.

Finally, the Showalters argue that the trial court erred in awarding them a flat fee of $500 for appraisal, attorneys' and engineering fees. Although a $500 flat fee is authorized by Section 610 of the Eminent Domain Code, 26 P.S. 1–610,[11] the

---

11. We note that Section 610 provides for "limited reimbursement." Section 610 provides

> Limited reimbursement of appraisal, attorney and engineering fees

The owner of any right, title, or interest in real property acquired or injured by an acquiring agency, who is not eligible for reimbursement of such fees under sections 406(e), 408 or 609 of this act, shall be

Showalters contend Section 610 is unconstitutional. The Showalters failed to raise this issue in their Concise Statement of Matters Complained of on Appeal. It has not been properly preserved for our review, and it is waived.

For the foregoing reasons, we reverse the order of the trial court denying the Showalters' post-trial motions and remand this matter for proceedings consistent with this opinion.

## ORDER

AND NOW, this 28th day of February, 2006, the order of the Court of Common Pleas of Bucks County denying the Showalters' post-trial motions is hereby reversed, and the matter is remanded for proceedings consistent with this opinion.

Jurisdiction relinquished.

reimbursed *in an amount not to exceed five hundred dollars* ($500) as a *payment toward reasonable expenses actually incurred for appraisal, attorney and engineering fees.*
26 P.S. 1–610 (emphasis added). A plain reading of the statute does not indicate legislative intent to compensate a condemnee for all of the expenses incurred in the condemnation litigation, nor does it create a constitutional right to reimbursement in part or in full for such expenses.