IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Tank Car Corporation of America, | : | **CONSOLIDATED CASES** |
| Appellant | : | |
| | : | |
| v. | : | No. 1043 C.D. 2021 |
| | : | |
| Springfield Township | : | |
| | : | |
| | : | |
| Tank Car Corporation of America | : | |
| | : | |
| v. | : | No. 1096 C.D. 2021 |
| | : | |
| Springfield Township, | : | Argued: September 11, 2023 |
| Appellant | : | |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE ELLEN CEISLER, Judge

OPINION
BY JUDGE McCULLOUGH                    FILED: October 19, 2023

In the instant eminent domain matter, we have consolidated two separate appeals from the December 16, 2021 judgment of the Montgomery County Court of Common Pleas (trial court), entered after a non-jury trial. The judgment awarded the condemnee, Tank Car Corporation of America (Tank Car), $517,000 in just compensation and $4,000 for fee reimbursement, for a total amount of $521,000, for Springfield Township's (Township) taking of 1725 Walnut Avenue in the Township (Property) for use as a public park.

The first appeal, No. 1043 C.D. 2021, is by Tank Car. In its appeal, Tank Car challenges several of the trial court's evidentiary findings as against the weight of the evidence. Tank Car also argues that the trial court made several errors in arriving at the valuation of the Property. The second appeal, No. 1096 C.D. 2021, is by the Township. The issue presented by the Township is whether the trial court erred by not accepting its expert appraiser's testimony of a 20% reduction for environmental stigma.[1] After careful review, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

Tank Car acquired the Property in 1921 and used it for the operation of a railroad tank car cleaning and rehabilitation business and ceased operations in 2001 or 2002. (Reproduced Record (R.R.) at 971a-75a, 1001a-02a, 2434a.) The Property consists of approximately 7.89 acres of land and includes a 25,000-square foot warehouse, attached offices, and three detached buildings. The Property is zoned industrial and is surrounded by other industrial sites. *Id.* at 920a, 2148a, 2585a. Tank Car's "former industrial operations at the facility produced hazardous wastes and liquids containing hazardous substances that were placed in a lagoon and later into buried tanker cars at the [P]roperty." *Id.* at 1112a-13a. As of 2006, the Property was substantially contaminated with hazardous materials. *Id.* at 2434a.

### A. Environmental Cleanup of the Property

On or about April 10, 2006, the United States Environmental Protection Agency (EPA) declared the Property a Superfund site and began to evaluate the Property under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601. The EPA ultimately decided to remove hazardous substances from the site. (R.R. at 2078a.) The EPA completed the removal

---

[1] By order dated December 6, 2021, we consolidated the cases.

action in May 2011. The EPA left contaminated soils and sandblast grit from the Property and surrounding parcels beneath a cover (referred to as the "cap") constructed to eliminate migration of such material and to prevent contact by humans and animals. *Id.* at 2079a. The cap is approximately two feet thick and consists of a layer of clay topped with modified stone. *Id.* at 2079a-80a. The cap covers approximately 50% of the total surface of the Property and is generally located in the northeastern area of the Property. *Id.* at 2434a.

### B. Lease of the Property

Two years after the EPA cleanup was completed, Tank Car entered into a long-term Lease Agreement (Lease) on May 22, 2013, with Cheltenham Transportation, LLC, allowing it to park school buses on the Property. The term of the Lease was ten years, with an option to extend the term another five years. The $7,500 monthly rent was due to increase by 3% each year. The Lease provided that the parties would negotiate for additional monthly rent relative to increased use of the Property. *Id.* at 1894a.

After entering into the Lease, Cheltenham Transportation began installing a fence and light posts on the Property, without first notifying the Township. *Id.* at 2436a. The Township, concerned that the activity was possibly in violation of the EPA restrictions relating to the cap, contacted the EPA. *Id.* at 2436a. The EPA representative expressed his concern that the work, especially digging in the soil, had been done in violation of the cap restrictions. *Id.* at 2436a.

On July 19, 2013, the Township brought an action in the trial court against Cheltenham Transportation and Tank Car. *Id.* at 436a. In its complaint and a motion for preliminary injunction filed the same day, the Township asserted that Cheltenham Transportation's activities on the Property were in violation of the Township Code,

3

specifically the Springfield Township Pennsylvania Subdivision and Land Development Ordinance of 1950, as amended, and the use restrictions imposed by the EPA. *Id.* at 2436a. On August 28, 2013, the trial court granted the Township's motion and entered a preliminary injunction order which, *inter alia*, enjoined Cheltenham Transportation and Tank Car from conducting any demolition or improvement on the Property without first obtaining a waiver or subdivision and land development approval from the Township and directed them to immediately remove all buses, light poles, trailers, and stone deposited on the Property. *Id.* at 1813a-14a.

Shortly after issuance of the preliminary injunction order, Cheltenham Transportation and the Township entered into an agreement under which Cheltenham Transportation would operate its school bus depot at a nearby property known as the Giuliani Property, subject to various conditions, including the prompt submission of a land development application for use of that property. *Id.* at 1907a-08a, 2437a. Following the issuance of the preliminary injunction order, Cheltenham Transportation has stored its buses exclusively on the Giuliani Property and has not occupied or used the Property for any purpose. *Id.* at 1801a, 2437a.

On April 22, 2015, Cheltenham Transportation submitted a Land Use Development Application for the Property, and an Amended Application on May 8, 2015. *Id.* at 904a-07a. The Amended Application was reviewed by the Township Engineer and the Montgomery County Planning Commission, both of whom made recommendations for changes. *Id.* at 910a. However, Cheltenham Transportation never submitted any revised plans. At the December 7, 2015 Workshop Meeting of the Township Board of Commissioners, an attorney for Cheltenham Transportation appeared and stated that the Amended Application was set aside until the issues with

4

the Giuliani Property were resolved at which point the Amended Application for the Property would be withdrawn. *Id.* at 928a.

### C. Declaration of Taking

On September 8, 2015, the Township Board of Commissioners adopted a Resolution authorizing the condemnation of the Property for the purpose of establishing a public park.[2] *Id.* at 2439a. On October 30, 2015, the Township filed a declaration of taking, condemning the Property. Although Tank Car initially filed preliminary objections to the declaration of taking, it later withdrew the objections and tendered possession of the Property to the Township. *Id.* at 919a-20a, 1797a, 2345a. In January 2017, the Township paid Tank Car $150,000 in estimated just compensation. *Id.* at 920a.

On March 6, 2017, Tank Car filed a Petition for Appointment of a Board of View. The Board of View viewed the Property and held hearings on June 5, 2018, and July 16, 2018. The Board of View issued a Report and Award on August 15, 2018, and awarded Tank Car damages in the amount of $1,000,000, less the $150,000 already paid to Tank Car by the Township. *Id.* at 24a-26a. Both Tank Car and the Township appealed.

The trial court held a three-day non-jury trial on February 22-24, 2021, and entered its Decision on May 18, 2021.

---

[2] The Township has not proceeded with the redevelopment of the Property as a public park, pending resolution of the present case. As part of the redevelopment, it intends to seek liability protection under the Land Recycling and Environmental Remediation Standards Act, Act of May 19, 1995, P.L. 4, No. 2, 35 P.S. §§ 6026.101-.908, commonly known as Act 2. Under Act 2, a party is required to clean up soil or groundwater to certain risk-based standards that the Department of Environmental Protection has previously determined protect the environment. Act 2 does not require the remediator to entirely remove a released constituent from the environment, if even technically feasible, but rather provides a standard that, when met, releases a party from further cleanup liability for that constituent. *See* Section 501(a) of Act 2, 35 P.S. § 6026.501(a).

### D. Valuation Evidence Before the Trial Court

At the trial, Tank Car's expert appraiser, Michael J. Barth, testified regarding the value of the Property as of the date of the taking. Reaves C. Lukens testified as the Township's expert appraiser.

### 1. Tank Car's Appraiser's Valuation of the Property

Barth opined that the highest and best use of the Property was "an industrial use to either . . . repurpose it for industrial warehouse use along with storing on the land or use the site to store buses on." *Id.* at 1002a. He opined that a buyer of the Property would renovate, rather than demolish, the main "buildings on the Property." *Id.* Barth used three different appraisal methodologies to determine the Property's value before the taking: (1) the Sales Comparison Approach;[3] (2) Income Capitalization Approach—Direct Capitalization Method (*i.e.*, the traditional Income Capitalization Approach),[4] based on the existence of the Lease; and (3) Income Capitalization Approach—Discounted Cash Flow Method (which he characterized as a "hybrid" of Income Capitalization and Sales Comparison). *Id.* at 1003a-37a, 1074a-93a, 2167a-78a, 2179a-92a.

Barth considered the Sales Comparison Approach as the best valuation method for the Property because in his opinion the Property is best suited as an owner-occupied property. He valued the Property as environmentally remediated and approved for industrial use and, thus, did not make any downward adjustments to the

---

[3] Under the "Sales Comparison Approach," which is sometimes referred to as the "market data approach," the appraiser of condemned property theorizes that if a similar property located in similar surroundings has sold recently at a given price, the price is relevant in predicting the market value of the property being appraised. *In re Condemnation of 23.015 Acres More or Less Known as Tax Map*, 895 A.2d 76 (Pa. Cmwlth. 2006).

[4] Essentially, the Income Capitalization Approach capitalizes the property's annual net income (gross income less actual annual expenditures).

6

value of the Property for the restrictions imposed by the "cap" or any other environmental condition thereon. *Id.* at 1122a, 2140a, 2161a-62a. Barth had never before appraised any Superfund sites. *Id.* at 2441a. He was unable to opine that the environmental history of the Subject Property had "absolutely no impact on the value." *Id.* at 1122a, 2444a. Barth conceded that "willing and informed buyers are reluctant to acquire environmentally contaminated property without some liability protection." *Id.* at 1175a.

Under the Sales Comparison Approach, Barth identified six properties with improvements representing comparable sales:

1. The 15.79-acre property located at 421 Alan Wood Road in Plymouth Township, zoned light industrial, which the Danella Construction Company purchased in December 2012 for $344,261 per acre to use for truck repair and sales facility. (R.R. at 1008a-10a.) It is located within a short distance from the on-ramp to Route 476. *Id.* at 1008a.

2. The 13.280-acre property located in the industrial park at 375 Commerce Drive, Fort Washington, purchased in October 2014 for $209,488 per acre. This property is located the closest to the Property. *Id.* at 1011a. It was formerly zoned limited industrial but re-zoned as an employment center to reinvigorate the industrial park but which zoning still allows industrial uses. *Id.* at 1011a, 1149a, 1407a. The buyer paid a third party to environmentally clean up the property prior to purchase. *Id.* at 1280a-81a, 1538a-39a.

3. The 6.97-acre property located at 409 E. Butler Avenue, New Britain, Bucks County which was zoned light industrial and purchased in October 2014 for $301,291 per acre. The property is improved with the EF Knoll picture frame manufacturing facility. Although it was acquired in order to obtain approvals for mixed-use development, the purchase price was based on uses permitted under the light industrial zoning. *Id.* at 1012a.

7

4. The 7.840-acre property located at 2030 Chemical Road, Plymouth Township, Montgomery County, which was purchased in December 2014 for $165,816 per acre. *Id.* at 1012a-13a. The property was zoned half light industrial and half residential. *Id.* at 1013a. The buyer had to obtain an easement to gain access to the property. The property is located near the off-ramp to Route 476 but the route to gain access to that highway is circuitous. *Id.* at 1013a-14a.

5. The 6.050-acre property located at 861 N. Easton Road in Plymouth Township, Bucks County, which was zoned light industrial and purchased in May 2015 for $264,463 per acre. The Fred Bean dealership acquired the property to store vehicles. Car dealerships are in need of land to store vehicles. *Id.* at 1014a.

6. The 4.450-acre property located at 1651 Ridge Pike in Plymouth Township which was zoned heavy industrial and sold in September 2015 for $333,708 per acre. *Id.* at 1014a-15a. The Conicelli auto dealership acquired the property for auto storage. *Id.* at 1015a.

Barth adjusted the values of comparables 1, 3, 5, and 6 down and the values of comparables 2 and 4 up to arrive at a per acre price of $240,000 for the Property, as vacant. *Id.* at 1016a-20a, 2170a. He rounded the total value of the Property, as vacant, to $1,900,000. *Id.* at 1019a-20a, 1034a, 2169a.[5]

In order to value the Property as improved, Barth utilized six comparables. *Id.* at 1081a-92a, 2180a. Barth explained how the sixth comparable located at 504 Swedeland Road in Upper Merion supported his valuation. *Id.* at 1087a-88a. The property contained a 21,000-square-foot steel frame masonry industrial building built

---

[5] Barth further valued the Property using a sales comparison approach as unencumbered and improved. (R.R at 1081a-92a, 2179a-88a.)

in 1960 located on 4.86 acres that included a floodplain. *Id.* at 1089a. Although the buyer negotiated the purchase price in 2015, due to title issues the sale did not close until 2018. *Id.* at 1088a, 2188a. The buyer paid a total of $1,900,000 for the 22,000-square-foot building and 4.86 acres. *Id.* at 1088a-89a. The buyer reskinned the building, leveled out and raised the floor, cleaned up the crane way and turned the building into an indoor recreation facility. *Id.* at 1090a. The owner leased the re-clad industrial buildings at $4.00 to $4.50 per square foot in 2015. Barth adjusted this $1,900,000 comparable up since the Property had a larger building, more land, and was situated in the Township and surrounded by other uses, including residential, to arrive at a total value of $2,105,000. *Id.* at 1091a-92a, 2188a. Similarly, Barth testified that the warehouse could be repurposed, or the Property could be used as a bus depot. *Id.* at 1002a. Barth observed that the warehouse, with its 25-foot ceiling height and steel frame, could be re-clad and made into a productive industrial building. *Id.* at 977a. Barth explained that starting in 2010, more buyers were looking to refurbish old industrial buildings, instead of demolishing them and waiting to obtain approvals to re-build. *Id.* at 996a. He concluded that the warehouse "would be a very desirable building for someone to come in and rehabilitate and clean up and reuse." *Id.* at 996-97a. On the basis of these sales, after making some adjustments, he calculated the value of a fee simple interest in the Property as of the date of the taking as $2,105,000. *Id.* at 1081a-92a, 2182a, 2188a.

Barth's Income Capitalization Approach—Discounted Cash Flow Method analysis assumed that the Lease was in effect, and there were eight years left. *Id.* at 985a-1002a. Applying the Income Capitalization Approach—Discounted Cash Flow Method, Barth valued the reversionary interest in the land and the value of the stream of income over the term of the Lease to arrive at a value of $2,060,000. *Id.* at

9

1022a-80a.  Finally, using the Income Capitalization Approach—Direct Capitalization Method, Barth valued the Property "as was" at $2,040,000.  *Id.* at 1092a-93a, 2189a-92a.

Reconciling his three approaches to valuation, Barth concluded that the "as was" market value of the Property was $2,100,000.  *Id.* at 1094a, 2193a.

### 2. The Township's Appraiser's Valuation of the Property

Lukens had experience appraising several properties with environmental contamination. *Id.* at 2445a.  Lukens testified that the highest and best use of the Property was for industrial use, specifically "[w]arehouse development." *Id.* at 1355a. Unlike Barth, Lukens opined that a reasonable buyer would want to acquire the Property in vacant condition and would therefore demolish the existing buildings, which had all outlived their useful lives and were detracting from the value of the Property.  *Id.* at 2244a.  Lukens further opined that a reasonable buyer would require that Act 2 liability protection be obtained on the Property.  *Id.* at 2445a.  He acknowledged that Act 2 remediation is voluntary but stated that no "buyer in [his] right mind" would buy the Property without getting Act 2 clearance.  *Id.* at 1480a, 2445a-46a.  Lukens testified that:

> Property owners only want to be accountable for environmental contamination that they caused. The Act 2 clearance helps to collar that responsibility. Properties are very difficult to finance that are adversely environmentally impacted without an Act 2 clearance, and most prudent people do not buy into that sort of a problem without getting it addressed and without reducing their exposure.

*Id.* at 1345a-46a.

In arriving at a value for the Property, Lukens considered a report prepared by Penn E&R, which was retained by the Township in 2015 to perform an analysis of what it would cost to receive an Act 2 release for an industrial use of the Property.  *Id.*

10

at 1341.  The Penn E&R cost estimate was $258,200.  Lukens testified that the value of the Property should be adjusted downward by the cost of the Act 2 remediation. Lukens added a 10% contingency to the Penn E&R estimate, resulting in a rounded number of $284,000.  *Id.* at 1344a, 1479a, 2446a-47a.  Lukens testified that the estimate was the type of report that he and other appraisers customarily rely upon in forming opinions of value.  *Id.* at 1338a-39a.

Lukens further opined that because a reasonable buyer would want the Property to be vacant, an appraisal based on the Income Capitalization Approach would not be appropriate, and the only proper approach would be the Sales Comparison Approach.  *Id.* at 2446a.  Under the Sales Comparison Approach, Lukens identified four properties representing comparable sales.  Based on these values, Lukens concluded that the Property's value, as hypothetically clean and before deductions, was $750,000 (*i.e.*, $95,000 per acre) as of the date of the taking.  *Id.* at 1369a-70a.

Lukens then further reduced the value of the Property by two deductions. First, Lukens deducted from the value of the Property the cost of demolishing the existing buildings, which costs he estimated to be $175,000.  *Id.* at 1376a.  Second, Lukens reduced the value of the Property by deducting 20% of its value for "environmental stigma," which he opined reduced the value of the Property by $150,000.  *Id.* at 1372a-75a, 1650a.

### E.    The Lease Between Cheltenham Transportation and Tank Car

Tank Car presented evidence in an effort to establish that the Lease was "in effect," and that land development approval was reasonably available as of the date of the taking.  To that end, Tank Car presented the testimony of Melissa Gordon, President of Tank Car, and Eric Faust, President of Cheltenham Transportation, both of whom testified that they considered the Lease to be in effect before and after the

11

taking. Tank Car also presented evidence and argument that the Township accepted Cheltenham Transportation's standing to file and proceed in the land development premised on the Lease being in effect, and that the Amended Application remained pending on the date of taking.

To rebut Tank Car's evidence, the Township presented evidence that Cheltenham Transportation's attorney informed the Board of Commissioners that the Amended Application had been "back-burnered" or withdrawn to focus on obtaining approval of the use of the Giuliani Property, and the admission made in Tank Car's preliminary objections that the Lease was canceled. It also argued that, in verified Preliminary Objections to the Declaration of Taking filing with the trial court, Gordon had averred under penalty of law that following the issuance of the Preliminary Injunction Order, Cheltenham Transportation "canceled its lease with Tank Car." (R.R. at 1801a.) The Township also elicited the following from Gordon on cross-examination: when she signed the verification "[t]he factual statements in that were true and correct to the best of [her] knowledge, yes;" after the preliminary injunction, no rent was owed by Cheltenham Transportation; neither party was fulfilling any duties under the Lease; Tank Car was leasing the Property to another party, and Cheltenham Transportation had begun leasing a separate property for its operation; and that except for the payment of the first and last months' rent at the outset of the Lease, Cheltenham Transportation has not made any payments of rent to Tank Car. *Id.* at 923-29a.

### F. Trial Court's Findings and Conclusions

After weighing the testimony of both Barth and Lukens, the trial court concluded that a reasonable buyer of the Property would demolish the buildings on site. (Trial Court Decision, May 18, 2021, Finding of Fact (FF) ¶ 82.) The trial court found that the condition of the buildings is so poor that renovation, even at a lower cost, would

12

be a far less desirable option, and that the fair market value of the Property is appropriately determined in an "as vacant" condition. *Id.* Additionally, the trial court found that the fair market value of the Property is best determined by the Sales Comparison Approach. (FF ¶ 83.) The trial court determined that all the properties used by the two appraisers for comparable sales bear significant differences, either positive or negative, from the Property. (FF ¶ 84.) While both appraisers made adjustments to reflect differences between the purportedly comparable properties and the Property, the trial court was not persuaded that the amounts of the adjustments were sufficient, especially where certain differences were not expressly taken into consideration. (FF ¶ 86.) As a result, the trial court found that neither appraiser's valuation accurately states the fair market value of the Property but that, after review of all the evidence and after hearing the testimony of the two appraisers, the analysis by Lukens reflects the value of the Property somewhat more accurately than the analysis by Barth under the Sales Comparison Approach and is entitled to slightly more weight. (FF ¶ 88.)

The trial court concluded that the value of the Property is $1,100,000, subject to two adjustments. (FF ¶ 89.) First, because the trial court found that a reasonable buyer would demolish the existing buildings, the Property value should therefore be adjusted downward by $175,000, the estimated cost of demolition. (FF ¶ 90.) Second, the trial court accepted Lukens' opinion that any reasonable buyer of the Property would require that Act 2 liability protection be obtained, and that no buyer would buy the Property without getting Act 2 clearance. The trial court found this testimony credible, especially in view of Lukens' experience in appraising properties that had experienced environmental contamination. The trial court concluded that Lukens testified credibly that the value of the Property should be adjusted downward

13

by the cost of the Act 2 remediation. As a result, the trial court found that the value of the Property should be adjusted downward by $258,200, based on Lukens' estimated cost of Act 2 remediation. (FF ¶ 92.) The trial court rejected the extra 10% contingency proposed by Lukens. Subtracting these two adjustments to the valuation, the trial court concluded that the fair market value of the Property as of the date of the taking was $667,000. (FF ¶ 93.)

The trial court rejected Lukens' application of the "environmental stigma" deduction, finding that

> [t]his figure does not reflect an additional adjustment, apart from the cost of Act 2 compliance, for environmental stigma or taint. It is likely that such an adjustment would be appropriate, especially in view of the ongoing restrictions on the use of the Property imposed by the cap. The evidence of record, however, is not sufficient to determine the amount of any such adjustment. Because of such failure of proof, the [trial c]ourt makes no adjustment for environmental stigma.

(FF ¶ 94.)

The trial court further explained:

> Mr. Lukens supported his 20% adjustment on the basis of a purported 29% difference in value between two other properties that he attributed to environmental stigma. In view of the legal standard for determining a reduction in value for environmental stigma, the [trial c]ourt does not consider a single comparison between only one pair of properties as a sufficient evidentiary foundation.

(FF ¶ 94, n.5) (citations omitted).

With regard to whether the Lease existed at the time of the taking, the trial court concluded that there was no Lease in effect between Tank Car and Cheltenham

14

Transportation as of the date of the taking. The trial court based its conclusion on the following findings of fact:

> 26. Since the issuance of the Preliminary Injunction Order and the agreement with the Township, Cheltenham Transportation has stored its buses exclusively on the Giuliani Property and has not occupied or used the Tank Car Property for any purpose.

> 27. In a filing with [that the trial c]ourt, the President of Tank Car has averred under penalty of law that following the issuance of the Preliminary Injunction Order, Cheltenham Transportation "canceled its lease with Tank Car."

> 28. There does not appear to be any document formally canceling the Lease [].

> 29. Except for the payment of the first and last months' rent at the outset of the Lease . . . , Cheltenham Transportation has not made any payments of rent to Tank Car.

> 30. Following the issuance of the Preliminary Injunction Order, Tank Car leased a portion of the Property to another tenant, notwithstanding the provision in the Lease . . . with Cheltenham Transportation prohibiting any other tenants on the Property.

> 31. Cheltenham Transportation took no further action to seek land development approval from the Township for use of the Tank Car Property until April of 2015, when it submitted an application for land development approval.

> 32. On July 8, 2015, the Township Board of Commissioners amended its Subdivision and Land Development Ordinance to create a new Limited Industrial zoning district (sometimes referred to as Light Industrial). The Property was rezoned as Limited Industrial. Pursuant to

15

applicable law, this amendment did not affect Cheltenham Transportation's pending application on the Property.

33.     Cheltenham Transportation did not press its application aggressively. Rather, as counsel for Cheltenham Transportation acknowledged at a workshop meeting of the Township Board of Commissioners on December 7, 2015, the understanding was that the application would be "back-burnered" or withdrawn to focus on obtaining final approval on use of the Giuliani Property. (Ex. P-34, p. I L)

34.     The Township Board of Commissioners approved Cheltenham Transportation's land development plan for the Giuliani Property in February 2016.

35.     Under all of the circumstances, the Court finds that there was no lease in effect between Tank Car and Cheltenham Transportation as of the date of taking.

(FF ¶ ¶ 26-35.)

The trial court's judgment was entered as final on December 16, 2021. Both parties filed motions for post-trial relief that were denied by order dated August 11, 2021.

## II.     TANK CAR'S APPEAL

### A. ISSUES

On appeal,[6] Tank Car raises four issues:

1. Whether the trial court erred by disregarding the long-term Lease Agreement between Tank Car and Cheltenham Transportation in disregard of the weight of the evidence to the contrary, including, without limitation, the Township's

---

[6] This Court's review in an eminent domain proceeding is limited to determining whether the findings of fact are supported by substantial evidence and whether the trial court committed an error of law. *Lehigh-Northampton Airport Authority v. Fuller*, 862 A.2d 159, 164 n.1 (Pa. Cmwlth. 2004). This Court may not reweigh the evidence or substitute its own judgment for that of the factfinder. *Swift v. Department of Transportation*, 937 A.2d 1162, 1167 n.5 (Pa. Cmwlth. 2007).

16

admissions, and therefore erroneously disregarded said Lease as probative of the highest and best use of the Property and its value.

2. Whether the trial court erred by reducing the amount of just compensation by the application of comparable sales with artificially deflated values, by erroneously and inconsistently rejecting Tank Car's expert appraiser's comparables and crediting and preferring the Township's expert appraiser's comparables.

3. Whether the trial court erred by deducting, dollar-for-dollar unsubstantiated costs related to obtaining voluntary Act 2 compliance, particularly where, the trial court's reliance on *B.P. Oil Co. v. Board of Assessment Appeals*, 633 A.2d 1241 (Pa. Cmwlth. 1993), in applying a cost-to-cure approach was erroneous, decisions from sister states indicate that the trial court should not have considered environmental remediation costs in determining just compensation, and even assuming, arguendo, the trial court properly considered any environmental remediation costs, it was error to do so in this case because the Township's appraiser lacked the requisite knowledge to testify regarding unsubstantiated costs relating to voluntary Act 2 compliance, and there was therefore no evidence as to Act 2 compliance costs.

4. Whether the trial court erred by deducting the costs of demolishing the buildings on the Property from the Property's value and, thus, just compensation, based upon (1) *B.P. Oil*, and (2) the trial court's finding that Tank Car's expert, Barth, utilized a "cost-to-cure" approach in valuing the Property, particularly where, *B.P. Oil* is inapposite, Barth did not utilize a "cost-to-cure" approach in applying the sales comparison method instead only making certain deductions in applying the income capitalization method, any need for demolition would not reduce the value of the Property dollar-for-dollar, and it was manifestly unreasonable for the trial court to conclude that demolition was necessary based on the evidence presented.

17

(Tank Car's Br. at 5-6.)

## B. ANALYSIS

### 1. Existence of the Lease as of the Date of the Taking

In its first issue, Tank Car argues that the trial court erred by determining that the Lease was not in effect as of the date of the taking. According to Tank Car, the trial court disregarded the clear weight of the evidence and its conclusions in this regard were not supported by substantial evidence. It maintains that "[t]he [trial court's] disregard of the Lease and the highest and best use of the Property [as a leased bus depot] as evidenced thereby resulted in an artificially deflated value of the Property." (Tank Car's Brief at 27, 30.)

Specifically, Tank Car argues that the trial court disregarded the testimony of the Presidents of Tank Car and Cheltenham Transportation, Faust and Gordon, both of whom testified that the Lease remained in effect on October 30, 2015. Tank Car further asserts that the trial court erred in relying on the statement Tank Car's counsel made in verified post-taking preliminary objections that Cheltenham Transportation "canceled its lease with Tank Car." (R.R. at 1800a-01a.) It also asserts that the trial court erred by relying on inconclusive statements made by Cheltenham Transportation's "substitute" counsel at a Township Workshop meeting during which she stated that "the Tank Car property kind of became back-burnered as we were focusing on [the Giuliani Property]." *Id.* at 2042a-43a.

Although it is not entirely clear from Tank Car's brief, we assume Tank Car is arguing that because a Lease was in existence at the time of the taking, the trial court was required to conclude that use, *i.e.*, the current use, was the highest and best use of the Property.

18

The law governing the Court's determination of just compensation payable upon the taking of real property by eminent domain is well established. Just compensation consists of "the difference between the fair market value of the condemnee's entire property interest immediately before the condemnation and as unaffected by the condemnation and the fair market value of the property interest remaining immediately after the condemnation and as affected by the condemnation." Section 702(a) of the Eminent Domain Code, 26 Pa. C.S. § 702(a). Fair market value is defined as:

> the price which would be agreed to by a willing and informed seller and buyer, taking into consideration but not limited to the following factors:
>
> (1) The present use of the property and its value for that use.
>
> (2) The highest and best reasonably available use of the property and its value for that use.
>
> (3) The machinery, equipment and fixtures forming part of the real estate taken.
>
> (4) Other factors as to which evidence may be offered as provided by Chapter 11 [ 23 Pa. C.S. §§ 1101-1106] (relating to evidence).

Section 703 of the Eminent Domain Code, 26 Pa. C.S. § 703.

The beneficial use of a property includes not only its present use, but also all potential uses including its highest and best use. *Visco v. Department of Transportation*, 498 A.2d 984 (Pa. Cmwlth. 1985). In the absence of evidence to the contrary, however, the presumption is that the property's current use is the highest and best use. *Id.*; *see also Shillito v. Metropolitan Edison Co.*, 252 A.2d 650 (Pa. 1969).

To the extent Tank Car argues such, the trial court was not required to *presume* the Property's current use (to lease it as a bus depot) is the highest and best use because the Township presented evidence to contradict such theory. Lukens testified that the highest and best use of the Property was warehouse industrial development. (R.R. at 1355a-56a.) The trial court was free to credit Lukens' opinion. *Lehigh-Northampton Airport Auth. v. WBF Associates, L.P.*, 728 A.2d 981, 991 (Pa. Cmwlth. 1999).

The trial court's factual finding that the Lease was not in effect was supported by substantial competent evidence. "[T]he weight and credibility of testimonial evidence is for the trial court as factfinder[.]" *Id.* at 991. The fact that there may have been testimony which conflicted with the findings of the trial court is irrelevant to the issue on appeal. "It is beyond peradventure that the trial court, sitting as the factfinder, is free to believe all, part or none of the evidence, to make all credibility determinations, and to resolve all conflicts in the evidence." *Laurel Road Homeowners Association, Inc. v. Freas*, 191 A.3d 938, 952 (Pa. Cmwlth. 2018).

Here, the trial court explained the basis for its conclusion that there was no Lease in effect at the time of the taking in its Pa.R.A.P. 1925(a) opinion.

> [T]he greater weight of the evidence, as presented by the Township, showed that the Lease [] was not in effect. Cheltenham Transportation did not act as if it had an operative Lease for the Property. Except for the payment of the first and last months' rent at the outset of the Lease [], Cheltenham Transportation did not make any payments of rent to Tank Car. Cheltenham Transportation took no further action to seek land development approval from the Township for use of the Tank Car Property until April of 2015, when it submitted an application for land development approval. Cheltenham Transportation did not press its application aggressively. Rather, as counsel for Cheltenham

Transportation acknowledged at a workshop meeting of the Township Board of Commissioners on December 7, 2015, the understanding was that the application would be "back-burnered" or withdrawn to focus on obtaining final approval on use of the Giuliani Property. The Township Board of Commissioners approved Cheltenham Transportation's land development plan for the Giuliani Property in February 2016.

The conduct of Tank Car similarly reflected an understanding that the Lease . . . was not in effect. Following the issuance of the Preliminary Injunction Order, Tank Car leased a portion of the Property to another tenant, notwithstanding the provision in the Lease . . . with Cheltenham Transportation prohibiting any other tenants on the Property. In a filing with this Court, the President of Tank Car averred under penalty of law that following the issuance of the Preliminary Injunction Order, Cheltenham Transportation "canceled its lease with Tank Car." Under all of the circumstances, the Court found in its Decision that there was no lease in effect between Tank Car and Cheltenham Transportation as of the date of taking.

(Trial Court's Pa.R.A.P. 1925(a) Opinion, at 6-7) (footnotes and citations omitted).

At trial, the Township presented evidence that negated the existence of the Lease as of the date of the taking, including: the lack of payment of rent beyond the initial deposits, the lackadaisical attitude of Cheltenham Transportation in seeking approval of the Township for use of the Property, the fact that Tank Car still did not have the legal right to operate on the Property and had not received land development approvals, and Tank Car's leasing of a portion of the Property to another tenant. The trial court found this evidence to be credible, and it is more than sufficient to support the trial court's conclusion that the Lease was not in effect as of the date of the taking. We cannot give different weight to the testimony of the witnesses or reverse the trial court's credibility determinations thereon, without assuming the fact-finding function

21

of the trial court. *In re Condemnation of Land for the Southeast Central Business District Redevelopment Area # 1*, 946 A.2d 1143, 1149 (Pa. Cmwlth. 2008).

## 2. Comparables

In its second issue, Tank Car argues that the trial court erroneously rejected Barth's comparables and credited and preferred Lukens' comparables. It spends ten pages of its brief rearguing the testimony of the two experts concerning valuation. Tank Car reviews the comparable properties relied upon by the experts and offers argument about why the trial court should have given more weight to Barth's opinions and less weight to Lukens' opinions. Once again, Tank Car misconstrues this Court's role on appeal.

Section 1105(2) of the Eminent Domain Code allows a qualified valuation expert to testify in detail as to the valuation of a subject property on, *inter alia*, a comparable market value basis. 26 Pa. C.S. § 1105(2). The Eminent Domain Code does not set forth specific criteria to determine what is "comparable" property. *In re Right of Way for Legislative Route 1023, Section 13, Deed Book 509, Page 302, Claim No. 3702545*, 406 A.2d 819 (Pa. Cmwlth. 1979). It is up to the trial court, therefore, to determine whether sales of property are indeed comparable. *In re Legislative Route 1094*, 352 A.2d 244 (Pa. Cmwlth. 1976); *Commonwealth v. Fox*, 328 A.2d 872 (Pa. Cmwlth. 1974). This decision must be made on a case-by-case basis. *In re Legislative Route 1094*, 352 A.2d at 350.

This Court has "acknowledged repeatedly that the valuation of property is not an exact science and that it is the fact finder's role to determine the weight to be accorded an expert's testimony in this area." *Cedarbrook Realty, Inc. v. Cheltenham Township*, 611 A.2d 335, 340 (Pa. Cmwlth. 1992). As a result, the trial court's

credibility and evidentiary weight determinations must be affirmed absent clear error. *Appeal of Mellon Bank, N.A.*, 467 A.2d 1201 (Pa. Cmwlth. 1983). "Once a determination is made that a witness is a qualified valuation expert, the credibility and the evidentiary weight of that testimony is reserved for the finder of fact." *McGaffic v. Redevelopment Authority*, 732 A.2d 663, 672 (Pa. Cmwlth. 1999). "Specifically, the factfinder may accept all, none or part of an expert's testimony, part of one expert's testimony and part of another's." *Green v. Schuylkill County Board of Assessment Appeals*, 730 A.2d 1017, 1021 (Pa. Cmwlth. 1999).

Here, the trial court considered all the comparable properties of both experts and found that all of them were significantly different than the Property. (FF 84.) As a result, the trial court found that neither appraiser's valuation accurately stated the fair market value of the Property but found that Lukens' appraisal was entitled to "slightly more weight." (FF ¶¶ 87, 88.) The trial court appropriately considered and rejected Tank Car's arguments concerning how it weighed the expert testimony. It found that Barth's comparables were substantially superior to the location of the Property, and the properties used by Barth as comparable sales were improved by buildings in substantially better condition than those on the Property. Although Barth made downward adjustments to reflect the poor condition of the Property, the trial court was not persuaded that the adjustments made were sufficient. We discern no error in the trial court's determination. The fact that the trial court reconciled the testimony of the two experts in a manner with which Tank Car disagrees does not provide a reason for this Court to set aside the trial court's findings and substitute its own findings.

### 3. Act 2 Remediation Costs

Tank Car argues that the trial court erred in finding that a reasonable buyer would have required Act 2 remediation as part of its purchase of the Property and by

23

adjusting downward the Property's value by $258,200, *i.e.*, the estimated Act 2 compliance costs. Tank Car maintains that the trial court erroneously applied the "cost to cure" approach in valuing the Property based upon its reading of *B.P. Oil*, because, in Tank Car's view, *B.P. Oil* did not approve a "cost to cure" approach. Tank Car also contends the trial court should not have relied on *B.P. Oil* because it was a tax assessment appeal case, not an eminent domain case.[7] Alternatively, it asserts that the trial court should not have afforded any weight to Lukens' testimony that the estimated cost for Act 2 remediation was $258,200 because Lukens improperly relied on the Penn E&R estimate created for the Township for the specific purpose of bringing the Property up to Department of Environmental Protection standards for a park, which it submits was hearsay.

First, we do not agree that the trial court erred in relying on *B.P. Oil*. In *B.P. Oil*, B.P. Oil (B.P.) challenged the property tax assessment of its land by the assessment board. B.P. owned a truck stop in Jefferson County. In 1992, the assessment board determined the property had a fair market value of $2.4 million. B.P. contested the valuation, stating that the fair market value should be reduced due to environmental contamination. 633 A.2d at 1242. At trial, B.P. presented evidence that the groundwater and soil on the property had been contaminated by a fuel leak from underground storage tanks and pipelines. This evidence indicated that the land was contaminated with toluene, ethylbenzene, benzene, and polynuclear aromatics. *Id.* B.P. introduced evidence that fair market value is commonly reduced based on

---

[7] Tank Car relies on several cases in other jurisdictions, including *Housing Authority of the City of New Brunswick v. Suydam Investors*, 826 A.2d 673, 685 (N.J. 2003) and *Department of Transportation v. Parr*, 633 N.E.2d 19 (Ill. App. 1994), to support its argument that the trial court should not have considered remediation costs when valuing the Property. Because we find the "cost to cure" approach to valuation of contaminated properties is valid in Pennsylvania we need not look to these other jurisdictions to decide the issue.

environmental factors. Additionally, it elicited expert testimony that it would take five years and $653,370 to clean up the contamination. *Id.* at 1243. B.P. also introduced the testimony of a real estate appraiser who, using the Cost to Cure Approach to determine fair market value, testified that "fair market value of the property is calculated by subtracting the cost to cure the contamination from the value the property would have if it were not contaminated." *Id.* B.P.'s appraiser estimated the property value under the Cost to Cure Approach to be $1,586,833, minus the estimated $653,370 for decontamination, bringing the proper valuation for tax assessment purposes to $933,630. The trial court concluded that B.P. failed to satisfy its burden of proving the assessment was invalid and upheld the board's assessment.

On appeal to this Court, B.P. argued that it had presented sufficient evidence to show that the assessment was inaccurate and that the board did not consider the impact of environmental contamination on the fair market value of the property. We accepted the approach of B.P.'s appraiser that "the fair market value of the property is calculated by subtracting the cost to cure the contamination from the value the property would have if it were not contaminated." 633 A.2d at 1243. As a result, this Court concluded that the landowners had presented "sufficient evidence to overcome the *prima facie* validity of the [b]oard's assessment." *Id.* Vacating the tax assessment and remanding the case for an assessment that was consistent with B.P.'s evidence, we explained,

> [B.P.'s] appraiser testified that the fair market value of the property in an uncontaminated state was $1,586,833.00; subtracting the $653,370.00 needed to cure the contamination from that figure reduces the fair market value of the property to $933,630.00. To rebut [B.P.'s] evidence, the [b]oard introduced the testimony of the assistant assessor of Jefferson County. The assessor testified that he calculated the fair market value of the property to be $2,400,000.00. The

25

assessor testified that he did not consider environmental contamination, when he determined the value of the property. In light of the above, we conclude that [B.P.] introduced sufficient evidence to overcome the *prima facie* validity of the [b]oard's assessment.

*Id.* at 1243.

*B.P. Oil* thus clearly approves of the Cost to Cure Approach in the valuation of contaminated property, as applied in this case.

In *Harley-Davidson Motor Co. v. Springettsbury Township*, 124 A.3d 270, 284 (Pa. 2015), our Supreme Court recognized that we used the Cost to Cure Approach in *B.P. Oil* and expressly declined to further rule on whether that approach "should be embraced in this Commonwealth." The Supreme Court's ruling, or refusal to rule, does not undermine our holding in *B.P. Oil*. Rather, the law as determined by the Commonwealth Court remains the binding law of Pennsylvania unless or until it is overruled or modified by the Supreme Court. *See Stackhouse v. Stackhouse*, 862 A.2d 102, 105 (Pa. Super. 2004) ("Decisions of the Commonwealth Court . . . remain precedential in trial courts across the Commonwealth . . . absent affirmative direction from the Supreme Court."). Accordingly, we find the Cost to Cure Approach is valid under Pennsylvania law and the trial court did not err in applying it.[8] Further, although *B.P. Oil* involved the valuation of property "for tax purposes," 633 A.2d at 1243, Tank Car has provided no argument on why the same principle would not apply equally to valuation for purposes of a condemnation.

Next, Tank Car's challenge to Lukens' reliance on the Penn E&R estimate ignores law that allows Lukens to rely upon reports of others not in evidence (*i.e.*,

---

[8] Moreover, as the trial court pointed out, Tank Car's expert Barth utilized this very approach, which Tank Car now seeks to discredit, in analyzing one of his comparable sales, *i.e.*, 504 Swedeland Road in Upper Merion Township. Barth subtracted from the value, the cost of installing a new "skin" on the building on the property because any buyer of the property would require such work to be done.

26

inadmissible hearsay) provided the reports are of the type customarily relied on by the expert in the field in forming opinions. *Betters v. Beaver County*, 200 A.3d 1044, 1049 (Pa. Cmwlth. 2018).

The Eminent Domain Code expressly permits this practice. *See* 26 Pa. C.S. § 1105(1) ("A qualified valuation expert may, on direct or cross-examination, state any or all facts and data which the expert considered in arriving at an opinion, whether or not the expert has personal knowledge of the facts and data, and a statement of the facts and data and the sources of information shall be subject to impeachment and rebuttal."). "When the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as [inadmissible] hearsay in disguise." *Woodard v. Chatterjee*, 827 A.2d 433, 444-45 (Pa. Super. 2003).[9]

Here, in arriving at an estimate of the cost for securing an Act 2 release of liability, Lukens testified that the Penn E&R estimate, upon which he relied, was the type of report reasonably relied upon by experts in his field. (R.R. at 1338a-39a.) Accordingly, we conclude that the trial court properly considered the evidence.[10]

---

[9] Tank Car also argues that the trial court's factual findings should be overturned based upon the Appraisal Foundation's Advisory Opinion AO-9 attached to its Brief as an appendix. *See* Tank Car's Br. at pp. 67-71. However, this document was not admitted into evidence, the trial court was not made aware of the document, and no testimony was presented as to its contents or authoritative character. Therefore, we find the issue waived. Moreover, we note that we have previously rejected other attempts to have industry literature elevated to the status of the law. *See Parkside Townhomes Association v. Board of Assessment Appeals of York County*, 711 A.2d 607, 611 (Pa. Cmwlth. 1998) (rejecting application of definitions in The Appraisal of Real Estate which were not in the law).

[10] To the extent Tank Car argues that the trial court erred in finding that a reasonable buyer would require Act 2 remediation in view of the environmental history of the Property and the presence of hazardous materials under the cap, (FF ¶ 91), we note that the trial court's factual finding in this
**(Footnote continued on next page…)**

#### 4. Cost of Demolishing the Warehouse

In its final issue, Tank Car argues that the trial court erred by deducting the costs of demolishing the warehouse from the Property's value and adjusting the Property's value downward by $175,000.

According to the trial court, Lukens testified credibly that the buildings were in such poor condition that any reasonable buyer would want to demolish rather than renovate them. He also testified that the estimated cost of demolition would be $175,000 and that the value of the Property should therefore be adjusted downward by this amount. Based on Lukens' testimony, the trial court concluded that the condition of the existing buildings is so poor that renovation, even at a lower cost, would be a far less desirable option and that the fair market value of the Property is appropriately determined in an "as vacant" condition. (FF ¶ 82.)

As we discussed, the "cost to cure" approach is valid under Pennsylvania law and, in fact, Tank Car's expert, Barth, applied the approach in analyzing one of his comparable sales, 504 Swedeland Road in Upper Merion Township. Specifically, Barth subtracted from the value the cost of installing a new "skin" on the building on that property because in his opinion any reasonable buyer would require that such work be done prior to purchase. Although the trial court was not persuaded that such a "re-skinning" was practical for the Property, the fact remains that Barth, like Lukens, applied the "cost to cure" approach that Tank Car now seeks to discredit. Accordingly, we find this issue to be without merit.

### III.    TOWNSHIP'S APPEAL

---

regard is actually supported by the opinion of Tank Car's own expert, Barth, who acknowledged that "willing and informed buyers are reluctant to acquire environmentally contamnated property without some liability protection." (R.R. at 1175a.)

In its cross-appeal, the Township raises one issue: whether the trial court erred in determining that the evidence relied upon by Lukens was insufficient as a matter of law to support a deduction for environmental stigma in determining the Property's fair market value.

In *Harley-Davidson*, the school district's appraiser applied a 5% downward adjustment to account for the "stigma" arising from the prior environmental contamination of the property. The Supreme Court explained the reasons why the trial court's credit of the appraiser's testimony was proper:

> [W]hile consideration of an environmental stigma may be examined when determining fair market value, expert testimony of such stigma may not be offered without any foundation.
>
> While a close call, we conclude that, considering the inherently imprecise nature of environmental stigma, [the appraiser's] 5% devaluation in the instant case was not based upon pure conjecture. **Rather, [the appraiser's] testimony suggests that it is standard practice in the appraisal community to apply a 5% reduction in the context of commercial/industrial property** (and a higher reduction for residential property). . . . [The appraiser's] testimony reflected his appraisal experience and professional judgment, which a court is entitled to accept. While an expert's opinion may not be based upon pure conjecture, we conclude that an appraisal expert's best efforts to quantify a reduction in property valuation as a result of a subjective and intangible stigma is permissible. As [the appraiser's] opinion regarding the environmental stigma associated with the property was not based upon improper factors, erroneous assumptions, or facts outside of the record, the trial court's crediting of this testimony was proper, and the Commonwealth Court's rejection of this expert testimony as unsupported was in error.

*Id.* at 286 (emphasis added) (citation omitted).

Instantly, the trial court's finding that Lukens' testimony was not sufficiently persuasive to support a 20% reduction absent testimony of a standard practice was entirely consistent with *Harley-Davidson*. The only basis Lukens gave for fixing the amount of the stigma reduction at 20% was his comparison to two similar industrial properties, one that had no environmental history and the other one that had been contaminated and then remediated. The trial court did not credit Lukens' testimony because he did not testify that it was standard practice in the appraisal community to apply the 20% reduction to reflect the stigma attached to a previously contaminated property. The trial court explained that, in the absence of any testimony of a specific percentage reduction that is "standard practice" for reflecting environmental stigma, a data set of only one pair of properties was not sufficient to persuade the trial court to apply a reduction by such a substantial factor as 20%. We discern no error in this rationale and conclusion.

## IV.  CONCLUSION

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____
PATRICIA A. McCULLOUGH, Judge

30

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Tank Car Corporation of America, | : | **CONSOLIDATED CASES** |
| Appellant | : | |
| | : | |
| v. | : | No. 1043 C.D. 2021 |
| | : | |
| Springfield Township | : | |
| | : | |
| | : | |
| Tank Car Corporation of America | : | |
| | : | |
| v. | : | No. 1096 C.D. 2021 |
| | : | |
| Springfield Township, | : | |
| Appellant | : | |

## *ORDER*

AND NOW, this 19th day of October, 2023, the December 16, 2021 judgment of the Montgomery County Court of Common Pleas is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge